UNITED STATES *v.* UNITED MINE WORKERS OF AMERICA.

Argued January 14, 1947.—Decided March 6, 1947.

260

*Attorney General Clark* and *Assistant Attorney General Sonnett* argued the cause for the United States.

With them on the brief were *Acting Solicitor General Washington, John Ford Baecher, Joseph M. Friedman* and *J. Francis Hayden.*

*Welly K. Hopkins* and *Joseph A. Padway* argued the cause for the United Mine Workers and John L. Lewis. With them on the brief were *Edmund Burke, T. C. Townsend, Harrison Combs, M. E. Boiarsky, Henry Kaiser* and *James A. Glenn.*

Briefs were filed as *amici curiae* by *George Moskowitz* and *Carl Rachlin* for the Workers Defense League; *Robert W. Kenny, Joseph Forer, David Rein* and *Herman A. Greenberg* for the National Lawyers Guild; *Lee Pressman, Eugene Cotton* and *Frank Donner* for the Congress of Industrial Organizations; and *William L. Standard* for the National Maritime Union of America, CIO, urging reversal.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

In October, 1946, the United States was in possession of, and operating, the major portion of the country's bituminous coal mines.[1]  Terms and conditions of employment

---

[1] The United States had taken possession of the mines pursuant to Executive Order 9728 of May 21, 1946, 11 F. R. 5593, in which the President, after determining that labor disturbances were interrupting the production of bituminous coal necessary for the operation of the national economy during the transition from war to peace, directed the Secretary of the Interior to take possession of and operate the mines and to negotiate with representatives of the miners concerning the terms and conditions of employment.

The President's action was taken under the Constitution, as President of the United States and Commander in Chief of the Army and Navy, and by virtue of the authority conferred upon him by the War Labor Disputes Act, 57 Stat. 163, 50 U. S. C. App. §§ 1501–1511. Section 3 of the Act authorizes the seizure of facilities necessary for the war effort if and when the President finds and proclaims that

were controlled "for the period of Government possession" by an agreement [2] entered into on May 29, 1946, between Secretary of the Interior Krug, as Coal Mines Administrator, and John L. Lewis, as President of the United Mine Workers of America.[3] The Krug-Lewis agreement embodied far-reaching changes favorable to the miners;[4] and, except as amended and supplemented therein, the agreement carried forward the terms and conditions of the National Bituminous Coal Wage Agreement of April 11, 1945.[5]

strikes or other labor disturbances are interrupting the operation of such facilities.

Section 3 directs that the authority under that section to take possession of the specified facilities will terminate with the ending of hostilities and that the authority under that section to operate facilities seized will terminate six months after the ending of hostilities. The President on December 31, 1946, proclaimed that hostilities were terminated on that day. 12 F. R. 1.

[2] The initial paragraph of the contract provided:

"This agreement between the Secretary of the Interior, acting as Coal Mines Administrator under the authority of Executive Order No. 9728 (dated May 21, 1946, 11 F. R. 5593), and the United Mine Workers of America, covers for the period of Government possession the terms and conditions of employment in respect to all mines in Government possession which were as of March 31, 1946, subject to the National Bituminous Coal Wage Agreement, dated April 11, 1945."

[3] In compliance with Executive Order No. 9728 and § 5 of the War Labor Disputes Act, the agreement had been submitted to and approved by the National Wage Stabilization Board.

[4] See p. 286 *infra*.

[5] The saving clause was in the following form:

"Except as amended and supplemented herein, this agreement carries forward and preserves the terms and conditions contained in all joint wage agreements effective April 1, 1941, through March 31, 1943, the supplemental agreement providing for the six (6) day workweek, and all the various district agreements executed between the United Mine Workers and the various Coal Associations and Coal Companies (based upon the aforesaid basic agreement) as they existed on March 31, 1943, and the National Bituminous Coal Wage Agreement, dated April 11, 1945."

On October 21, 1946, the defendant Lewis directed a letter to Secretary Krug and presented issues which led directly to the present controversy. According to the defendant Lewis, the Krug-Lewis agreement carried forward § 15 of the National Bituminous Coal Wage Agreement of April 11, 1945. Under that section either party to the contract was privileged to give ten days' notice in writing of a desire for a negotiating conference which the other party was required to attend; fifteen days after the beginning of the conference either party might give notice in writing of the termination of the agreement, effective five days after receipt of such notice. Asserting authority under this clause, the defendant Lewis in his letter of October 21 requested that a conference begin November 1 for the purpose of negotiating new arrangements concerning wages, hours, practices, and other pertinent matters appertaining to the bituminous coal industry.[6]

Captain N. H. Collisson, then Coal Mines Administrator, answered for Secretary Krug. Any contractual basis for requiring negotiations for revision of the Krug-Lewis agreement was denied.[7] In the opinion of the Government, § 15 of the 1945 agreement had not been preserved by the Krug-Lewis agreement; indeed, § 15 had been expressly nullified by the clause of the latter contract providing that the terms contained therein were to cover the period of Government possession. Although suggesting that any negotiations looking toward a new agreement be carried on with the mine owners, the Government expressed willingness to discuss matters affecting the operation of the mines under the terms of the Krug-Lewis agreement.

---

[6] The letter also charged certain breaches of contract by the Government and asserted significant changes in Government wage policy.

[7] Captain Collisson also specifically denied breaches of contract on the part of the Government.

Conferences were scheduled and began in Washington on November 1, both the union and the Government adhering to their opposing views regarding the right of either party to terminate the contract.[8]  At the fifth meeting, held on November 11, the union for the first time offered specific proposals for changes in wages and other conditions of employment.  On November 13 Secretary Krug requested the union to negotiate with the mine owners. This suggestion was rejected.[9]  On November 15 the union, by John L. Lewis, notified Secretary Krug that "Fifteen days having now elapsed since the beginning of said conference, the United Mine Workers of America, exercising its option hereby terminates said Krug-Lewis Agreement as of 12:00 o'clock P. M., Midnight, Wednesday, November 20, 1946."

Secretary Krug again notified the defendant Lewis that he had no power under the Krug-Lewis agreement or under the law to terminate the contract by unilateral declaration.[10]  The President of the United States announced his strong support of the Government's position and requested reconsideration by the union in order to avoid a national crisis.  However, the defendant Lewis, as union president, circulated to the mine workers copies of the November 15 letter to Secretary Krug.  This communication was for the "official information" of union members.

The United States on November 18 filed a complaint in the District Court for the District of Columbia against

---

[8] Conferences were carried on without prejudice to the claims of either party in this respect.

[9] Secretary Krug and defendant Lewis met privately on November 13 and again on November 14.

[10] Secretary Krug had been advised by the Attorney General, whose opinion had been sought, that § 15 of the 1945 agreement was no longer in force.

the United Mine Workers of America and John L. Lewis, individually and as president of the union. The suit was brought under the Declaratory Judgment Act[11] and sought judgment to the effect that the defendants had no power unilaterally to terminate the Krug-Lewis agreement. And, alleging that the November 15 notice was in reality a strike notice, the United States, pending the final determination of the cause, requested a temporary restraining order and preliminary injunctive relief.

The court, immediately and without notice to the defendants, issued a temporary order[12] restraining the

[11] Judicial Code, § 274d, 28 U. S. C. § 400.

[12] The pertinent part of the order was as follows:

"Now, THEREFORE, IT IS BY THE COURT this 18th day of November 1946,

"ORDERED that the defendants and each of them and their agents, servants, employees, and attorneys, and all persons in active concert or participation with them, be and they are hereby restrained pending further order of this Court from permitting to continue in effect the notice heretofore given by the defendant, John L. Lewis, to the Secretary of Interior dated November 15, 1946; and from issuing or otherwise giving publicity to any notice that or to the effect that the Krug-Lewis Agreement has been, is, or will at some future date be terminated, or that said agreement is or shall at some future date be nugatory or void at any time during Government possession of the bituminous coal mines; and from breaching any of their obligations under said Krug-Lewis Agreement; and from coercing, instigating, inducing, or encouraging the mine workers at the bituminous coal mines in the Government's possession, or any of them, or any person, to interfere by strike, slow down, walkout, cessation of work, or otherwise, with the operation of said mines by continuing in effect the aforesaid notice or by issuing any notice of termination of agreement or through any other means or device; and from interfering with or obstructing the exercise by the Secretary of the Interior of his functions under Executive Order 9728; and from taking any action which would interfere with this Court's jurisdiction or which would impair, obstruct, or render fruitless, the determination of this case by the Court;

"AND IT IS FURTHER ORDERED that this restraining order shall expire at 3 o'clock p. m. on November 27th, 1946, unless before such

defendants from continuing in effect the notice of November 15, from encouraging the mine workers to interfere with the operation of the mines by strike or cessation of work, and from taking any action which would interfere with the court's jurisdiction and its determination of the case. The order by its terms was to expire at 3:00 p. m. on November 27 unless extended for good cause shown. A hearing on the preliminary injunction was set for 10:00 a. m. on the same date. The order and complaint were served on the defendants on November 18.

A gradual walkout by the miners commenced on November 18, and, by midnight of November 20, consistent with the miners' "no contract, no work" policy, a full-blown strike was in progress. Mines furnishing the major part of the nation's bituminous coal production were idle.

On November 21 the United States filed a petition for a rule to show cause why the defendants should not be punished as and for contempt, alleging a willful violation of the restraining order. The rule issued, setting November 25 as the return day and, if at that time the contempt was not sufficiently purged, setting November 27 as the day for trial on the contempt charge.

On the return day, defendants, by counsel, informed the court that no action had been taken concerning the November 15 notice, and denied the jurisdiction of the court to issue the restraining order and rule to show cause. Trial on the contempt charge was thereupon ordered to begin as scheduled on November 27. On November 26 the defendants filed a motion to discharge and vacate the rule to show cause. Their motion challenged the jurisdiction of the court, and raised the grave question of

time the order for good cause shown is extended, or unless the defendants consent that it may be extended for a longer period;

"And it is further ordered that plaintiff's motion for preliminary injunction be set down for hearing on November 27th, 1946, at 10:00 o'clock a. m."

whether the Norris-LaGuardia Act [13] prohibited the granting of the temporary restraining order at the instance of the United States.[14]

After extending the temporary restraining order on November 27, and after full argument on November 27 and November 29, the court, on the latter date, overruled the motion and held that its power to issue the restraining order in this case was not affected by either the Norris-LaGuardia Act or the Clayton Act.[15]

The defendants thereupon pleaded not guilty and waived an advisory jury. Trial on the contempt charge proceeded. The Government presented eight witnesses, the defendants none. At the conclusion of the trial on

---

[13] 47 Stat. 70, 29 U. S. C. § 101.

[14] The grounds offered for the motion were:

"1. The Temporary Restraining Order is void in that this case involves and grows out of a labor dispute. Under the provisions of the Norris-LaGuardia Act (47 Stat. 70), and the provisions of Section 20 of the Clayton Act (38 U. S. Stat. C. 323, 730), this Honorable Court is without jurisdiction over the subject-matter of this cause.

"2. Equity acts only where there is no plain, adequate, and complete remedy at law. The allegations of the Petition for the Rule purport to show a violation of the War Labor Disputes Act—a serious offense—in which field there is no place for equity intervention.

"3. Observance of all the strict rules of criminal procedure is required to establish criminal contempt. It is apparent that the alleged facts set out in the unverified Petition and in the affidavit of Captain Collisson, filed in support of the Rule, are based wholly upon hearsay, information and belief and are not sufficient to sustain the Rule to Show Cause.

"4. The object of the Petition for the Rule is necessarily punitive and not compensatory. Accordingly, it being for criminal contempt, the Petition should have been presented as an independent proceeding and not as supplemental to the original cause.

"5. The Temporary Restraining Order is beyond the jurisdiction of this Honorable Court and therefore void because it contravenes the First, Fifth, and Thirteenth Amendments to the Constitution of the United States."

[15] 38 Stat. 730, 738, § 20, 29 U. S. C. § 52.

December 3, the court found that the defendants had permitted the November 15 notice to remain outstanding, had encouraged the miners to interfere by a strike with the operation of the mines and with the performance of governmental functions, and had interfered with the jurisdiction of the court. Both defendants were found guilty beyond reasonable doubt of both criminal and civil contempt dating from November 18. The court entered judgment on December 4, fining the defendant Lewis $10,000, and the defendant union $3,500,000. On the same day a preliminary injunction, effective until a final determination of the case, was issued in terms similar to those of the restraining order.

On December 5 the defendants filed notices of appeal from the judgments of contempt. The judgments were stayed pending the appeals. The United States on December 6 filed a petition for certiorari in both cases. Section 240 (a) of the Judicial Code authorizes a petition for certiorari by any party and the granting of certiorari prior to judgment in the Circuit Court of Appeals. Prompt settlement of this case being in the public interest, we granted certiorari on December 9, and subsequently, for similar reasons, granted petitions for certiorari filed by the defendants, 329 U. S. 708, 709, 710. The cases were consolidated for argument.

## I.

Defendants' first and principal contention is that the restraining order and preliminary injunction were issued in violation of the Clayton and Norris-LaGuardia Acts. We have come to a contrary decision.

It is true that Congress decreed in § 20 of the Clayton Act that "no such restraining order or injunction shall prohibit any person or persons . . . from recommending, advising, or persuading others . . ." to strike. But by the

Act itself this provision was made applicable only to cases "between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment . . . ." [16]   For reasons which will be explained at greater length in discussing the applicability of the Norris-LaGuardia Act, we cannot construe the general term "employer" to include the United States, where there is no express reference to the United States and no evident affirmative grounds for believing that Congress intended to withhold an otherwise available remedy from the Government as well as from a specified class of private persons.

Moreover, it seems never to have been suggested that the proscription on injunctions found in the Clayton Act is in any respect broader than that in the Norris-LaGuardia Act.   Defendants do not suggest in their argument that it is.   This Court, on the contrary, has stated that the Norris-LaGuardia Act "still further . . . [narrowed] the circumstances under which the federal courts could grant injunctions in labor disputes." [17]   Consequently, we would feel justified in this case to consider the application of the Norris-LaGuardia Act alone.   If it does not apply, neither does the less comprehensive proscription of the Clayton Act; [18] if it does, defendants' reliance on the Clayton Act is unnecessary.

By the Norris-LaGuardia Act, Congress divested the federal courts of jurisdiction to issue injunctions in a specified class of cases.   It would probably be conceded that the characteristics of the present case would be such

---

[16] *American Foundries* v. *Tri-City Council,* 257 U. S. 184, 202 (1921); *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 470 (1921).

[17] *United States* v. *Hutcheson,* 312 U. S. 219, 231 (1941).

[18] See also *Allen Bradley Co.* v. *Union,* 325 U. S. 797, 805 (1945); *United States* v. *Hutcheson,* 312 U. S. 219, 235, 236 (1941).

as to bring it within that class if the basic dispute had remained one between defendants and a private employer, and the latter had been the plaintiff below. So much seems to be found in the express terms of §§ 4 and 13 of the Act, set out in the margin.[19]  The specifications in

[19] "Sec. 4. No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

"(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 3 of this Act;

"(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

"(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

"(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

"(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

"(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 3 of this Act."

"Sec. 13. When used in this Act, and for the purposes of this Act—

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees;

§ 13 are in general terms and make no express exception of the United States. From these premises, defendants argue that the restraining order and injunction were forbidden by the Act and were wrongfully issued.

Even if our examination of the Act stopped here, we could hardly assent to this conclusion. There is an old and well-known rule that statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect.[20] It has been stated, in cases in which there were extraneous

whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined).

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

"(d) The term 'court of the United States' means any court of the United States whose jurisdiction has been or may be conferred or defined or limited by Act of Congress, including the courts of the District of Columbia."

[20] *Lewis* v. *United States,* 92 U. S. 618, 622 (1875); *United States* v. *Herron,* 20 Wall. 251, 263 (1873); see *Guarantee Co.* v. *Title Guaranty Co.,* 224 U. S. 152, 155 (1912).

and affirmative reasons for believing that the sovereign should also be deemed subject to a restrictive statute, that this rule was a rule of construction only.[21] Though that may be true, the rule has been invoked successfully in cases so closely similar to the present one,[22] and the statement of the rule in those cases has been so explicit,[23] that we are inclined to give it much weight here. Congress was not ignorant of the rule which those cases reiterated; and, with knowledge of that rule, Congress would not, in writing the Norris-LaGuardia Act, omit to use "clear and specific [language] to that effect" if it actually intended to reach the Government in all cases.

But we need not place entire reliance on this exclusionary rule. Section 2,[24] which declared the public policy of

[21] *United States* v. *California,* 297 U. S. 175, 186 (1936); *Green* v. *United States,* 9 Wall. 655, 658 (1869).

[22] *United States* v. *Stevenson,* 215 U. S. 190, 197 (1909); *United States* v. *American Bell Telephone Co.,* 159 U. S. 548, 553–555 (1895); *Dollar Savings Bank* v. *United States,* 19 Wall. 227, 238, 239 (1873).

[23] "The most general words that can be devised (for example, any person or persons, bodies politic or corporate) affect not him [the sovereign] in the least, if they may tend to restrain or diminish any of his rights or interests." *Dollar Savings Bank* v. *United States,* 19 Wall. 227, 239 (1873). "If such prohibition is intended to reach the Government in the use of known rights and remedies, the language must be clear and specific to that effect." *United States* v. *Stevenson,* 215 U. S. 190, 197 (1909).

In both these cases the question, as in the present case, was whether the United States was divested of a certain remedy by a statute or a rule of law which, without express reference to the United States, made that remedy generally unavailable.

[24] "SEC. 2. In the interpretation of this Act and in determining the jurisdiction and authority of the courts of the United States, as such jurisdiction and authority are herein defined and limited, the public policy of the United States is hereby declared as follows:

"Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual

the United States as a guide to the Act's interpretation, carries indications as to the scope of the Act. It predicates the purpose of the Act on the contrast between the position of the "individual unorganized worker" and that of the "owners of property" who have been permitted to "organize in the corporate and other forms of ownership association," and on the consequent helplessness of the worker "to exercise actual liberty of contract . . . and thereby to obtain acceptable terms and conditions of employment." The purpose of the Act is said to be to contribute to the worker's "full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives . . . for the purpose of collective bargaining . . . ." These considerations, on their face, obviously do not apply to the Government as an employer or to relations between the Government and its employees.

If we examine §§ 4 and 13, on which defendants rely, we note that they do not purport to strip completely from the federal courts all their pre-existing powers to issue injunctions, that they withdraw this power only in a speci-

---

unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the United States are hereby enacted."

fied type of case, and that this type is a case "involving or growing out of any labor dispute." Section 13, in the first instance, declares a case to be of this type when it "involves persons" or "involves any conflicting or competing interests" in a labor dispute of "persons" who stand in any one of several defined economic relationships. And "persons" must be involved on both sides of the case, or the conflicting interests of "persons" on both sides of the dispute. The Act does not define "persons." In common usage that term does not include the sovereign, and statutes employing it will ordinarily not be construed to do so.[25] Congress made express provision, R. S. § 1, 1 U. S. C. § 1, for the term to extend to partnerships and corporations, and in § 13 of the Act itself for it to extend to associations. The absence of any comparable provision extending the term to sovereign governments implies that Congress did not desire the term to extend to them.

Those clauses in § 13 (a) and (b) spelling out the position of "persons" relative to the employer-employee relationship affirmatively suggest that the United States, as an employer, was not meant to be included. Those clauses require that the case involve persons "who are engaged in the same industry, trade, craft, or occupation," who "have direct or indirect interests therein," who are "employees of the same employer," who are "members of the same or an affiliated organization of employers or employees," or who stand in some one of other specified positions relative to a dispute over the employer-employee relationship. Every one of these qualifications in § 13 (a) and (b) we think relates to an economic role ordinarily filled by a private individual or corporation, and not by a sovereign government. None of them is at all suggestive of any part played by the United States in its relations

---

[25] *United States* v. *Cooper Corp.,* 312 U. S. 600, 604 (1941); *United States* v. *Fox,* 94 U. S. 315, 321 (1876).

with its own employees. We think that Congress' failure to refer to the United States or to specify any role which it might commonly be thought to fill is strong indication that it did not intend that the Act should apply to situations in which the United States appears as employer.

In the type of case to which the Act applies, § 7 requires certain findings of fact as conditions precedent to the issuance of injunctions even for the limited purposes recognized by the Act. One such required finding is that "the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." Obviously, such finding could never be made if the complainant were the United States, and federal property were threatened by federal employees, as the responsibility of protection would then rest not only on state officers, but also on all federal civil and military forces. If these failed, a federal injunction would be a meaningless form. This provision, like those in §§ 2, 4 and 13, already discussed, indicates that the Act was not intended to affect the relations between the United States and its employees.

Defendants maintain that certain facts in the legislative history of the Act so clearly indicate an intent to restrict the Government's use of injunctions that all the foregoing arguments to the contrary must be rejected.

Representative Beck of Pennsylvania indicated in the course of the House debates that he thought the Government would be included within the prohibitions of the Act.[26] Mr. Beck was not a member of the Judiciary Committee which reported the bill, and did not vote

---

[26] 75 Cong. Rec. 5473. An amendment by Representative Beck, designed to save to the United States the right to intervene by injunction in private labor disputes, was defeated. 75 Cong. Rec. 5503, 5505.

for its passage. We do not accept his views as expressive of the attitude of Congress relative to the status of the United States under the Act.

Representative Blanton of Texas introduced an amendment to the bill which would have made an exception to the provision limiting the injunctive power "where the United States Government is the petitioner," and this amendment was defeated by the House.[27] But the first comment made on this amendment, after its introduction, was that of Representative LaGuardia, the House sponsor of the bill, who opposed it, not on the ground that such an exception should not be made, but rather on the ground that the express exception was unnecessary. Mr. LaGuardia read the definition of a person "participating or interested in a labor dispute" in § 13 (b), referred to the provisions of § 13 (a), and then added: "I do not see how in any possible way the United States can be brought in under the provisions of this bill." When Mr. Blanton thereupon suggested the necessity of allowing the Government to use injunctions to maintain discipline in the army and navy, Mr. LaGuardia pointed out that these services are not "a trade, craft, or occupation." Mr. Blanton's only answer to Mr. LaGuardia's opposition was that the latter "does not know what extensions will be made." A vote was then taken and the amendment defeated.[28] Obviously this incident does not reveal a Congressional intent to legislate concerning the relationship between the United States and its employees.

In the debates in both Houses of Congress numerous references were made to previous instances in which the United States had resorted to the injunctive process in labor disputes between private employers and private em-

---

[27] 75 Cong. Rec. 5503.

[28] *Ibid.*

ployees,[29] where some public interest was thought to have become involved. These instances were offered as illustrations of the abuses flowing from the use of injunctions in labor disputes and the desirability of placing a limitation thereon. The frequency of these references and the attention directed to their subject matter are compelling circumstances. We agree that they indicate that Congress, in passing the Act, did not intend to permit the United States to continue to intervene by injunction in purely private labor disputes.

But whether Congress so intended or not is a question different from the one before us now. Here we are concerned only with the Government's right to injunctive relief in a dispute with its own employees. Although we recognize that Congress intended to withdraw such remedy in the former situation, it does not follow that it intended to do so in the latter. The circumstances in which the Government sought such remedy in 1894 and 1922 were vastly different from those in which the Government is seeking to carry out its responsibilities by taking legal action against its own employees, and we think that the references in question have only the most distant and uncertain bearing on our present problem. Indeed, when we look further into the history of the Act, we find other events which unequivocally demonstrate that injunctive relief was not intended to be withdrawn in the latter situation.

When the House had before it a rule for the consideration of the bill, Representative Michener, a ranking minority member of the Judiciary Committee and spokesman for the minority party on the Rules Committee, made a general statement in the House concerning the subject matter of the bill and advocating its immediate consideration. In this survey he clearly stated that the Gov-

---

[29] Most frequently mentioned was the Government action in connection with the railway strikes of 1894 and 1922.

ernment's rights with respect to its own employees would not be affected: [30]

> "Be it remembered that this bill does not attempt to legislate concerning Government employees. I do not believe that the enactment of this bill into law will take away from the Federal Government any rights which it has under existing law, to seek and obtain injunctive relief where the same is necessary for the functioning of the Government."

In a later stage of the debate, Representative Michener repeated this view in the following terms: [31]

> "This deals with labor disputes between individuals, not where the Government is involved. It is my notion that under this bill the Government can function with an injunction, if that is necessary in order to carry out the purpose of the Government. I should like to see this clarified, but I want to go on record as saying that under my interpretation of this bill the Federal Government will not at any time be prevented from applying for an injunction, if one is necessary in order that the Government may function."

Representatives Michener and LaGuardia were members of the Judiciary Committee which reported and recommended the bill to the House. They were the most active spokesmen for the Committee, both in explaining the bill and advocating its passage. No member of the House who voted for the bill challenged their explanations. At least one other member expressed a like understanding.[32] We cannot but believe that the House ac-

[30] 75 Cong. Rec. 5464.

[31] 75 Cong. Rec. 5509.

[32] Representative Schneider, at 75 Cong. Rec. 5514, stated: "And it has also been pointed out that the enactment of this bill will not take away from the Federal Government any rights which it has under existing law to seek and obtain injunctive relief where the same is

cepted these authoritative representations as to the proper construction of the bill.[33]   The Senate expressed no contrary understanding,[34] and we must conclude that Congress, in passing the Act, did not intend to withdraw the Government's existing rights to injunctive relief against its own employees.

If we were to stop here, there would be little difficulty in accepting the decision of the District Court upon the scope of the Act.   And the cases in this Court express consistent views concerning the types of situations to which the Act applies.[35]   They have gone no farther than to follow Congressional desires by regarding as beyond the jurisdiction of the District Courts the issuance of injunctions sought by the United States and directed to persons who are not employees of the United States. None of these cases dealt with the narrow segment of the employer-employee relationship now before us.

deemed by Government officials to be necessary for the functioning of the Government.

"In other words, a tremendous field in which the injunction can still be used effectively will remain after the enactment of this bill."

[33] *United States* v. *Wrightwood Dairy Co.*, 315 U. S. 110, 125 (1942); *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 475 (1921).

[34] We have been cited to no instances in which the consideration of the Senate was directed to the specific issue of the relationship between the United States and its own employees.   The use of the injunction by the Government was in question, but primarily in respect to those instances in which the United States had taken action in private labor disputes, *e. g.*, 75 Cong. Rec. 4509, 4619, 4620, 4693, 5001, 5005. Silence upon the status of the Government as employer is not inconsistent with the desire of the House to exclude from the Act those disputes in which the United States is seeking relief against its own employees.

[35] *United States* v. *American Federation of Musicians,* 318 U. S. 741 (1943); see *United States* v. *Hutcheson,* 312 U. S. 219, 227 (1941).   In accord is *United States* v. *Weirton Steel Co.*, 7 F. Supp. 255 (1934); cf. *Anderson* v. *Bigelow,* 130 F. 2d 460 (1942).

But regardless of the determinative guidance so offered, defendants rely upon the opinions of several Senators uttered in May, 1943, while debating the Senate version of the War Labor Disputes Act.[36] The debate at that time centered around a substitute for the bill, S. 796, as originally introduced.[37] Section 5 of the substitute, as amended, provided, "The district courts of the United States and the United States courts of the Territories or possessions shall have jurisdiction, for cause shown, but solely upon application by the Attorney General or under his direction . . . to restrain violations or threatened violations of this act." [38] Following the rejection of other amendments aimed at permitting a much wider use of injunctions and characterized as contrary to the Norris-LaGuardia Act,[39] several Senators were of the opinion that § 5 itself would remove some of the protection given employees by that Act,[40] a view contrary to what we have just determined to be the scope of the Act as passed in 1932. Section 5 was defeated and no injunctive provisions were contained in the Senate bill.

We have considered these opinions, but cannot accept them as authoritative guides to the construction of the Norris-LaGuardia Act. They were expressed by Sena-

[36] It was upon § 3 of this Act that the President based in part the seizure of the bituminous coal mines. See note 1, *supra*.

[37] 89 Cong. Rec. 3812. The substitute bill embodied two amendments proposed by Senator Connally on the floor of the Senate. 89 Cong. Rec. 3809.

[38] Section 5 of the substitute bill originally did not limit the issuance of injunctions to those sought by the Attorney General, but Senator Wagner's proposal to insert "but solely upon application by the Attorney General or under his direction" was accepted. 89 Cong. Rec. 3986.

[39] A great number of the references to the Norris-LaGuardia Act were made in connection with the proposed Taft and Reed amendments. 89 Cong. Rec. 3897, 3984, 3985, 3986.

[40] Senators Connally and Danaher expressed this view and other Senators were apparently in accord. 89 Cong. Rec. 3988–9.

tors, some of whom were not members of the Senate in 1932, and none of whom was on the Senate Judiciary Committee which reported the bill. They were expressed eleven years after the Act was passed and cannot be accorded even the same weight as if made by the same individuals in the course of the Norris-LaGuardia debates.[41] Moreover, these opinions were given by individuals striving to write legislation from the floor of the Senate and working without the benefit of hearings and committee reports on the issues crucial to us here.[42] We fail to see how the remarks of these Senators in 1943 can serve to change the legislative intent of Congress expressed in 1932, and we accordingly adhere to our conclusion that the Norris-LaGuardia Act did not affect the jurisdiction of the courts to issue injunctions when sought by the United States in a labor dispute with its own employees.

It has been suggested, however, that Congress, in passing the War Labor Disputes Act, effectively restricted the theretofore existing authority of the courts to issue injunctions in connection with labor disputes in plants seized by the United States. Chief reliance is placed upon the rejection by the Senate of § 5 of the Connally substitute bill.[43] But it is clear that no com-

---

[41] See *United States* v. *Wrightwood Dairy Co.*, 315 U. S. 110, 125 (1942); *McCaughn* v. *Hershey Chocolate Co.*, 283 U. S. 488, 493 (1931); *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 474 (1921).

[42] 89 Cong. Rec. 3889, 3890, 3904–5.

[43] Section 5, as we have noted before, would have permitted issuing injunctions to restrain violations of the Act. It is not at all clear that the rejection of a proposal in this form should, in any event, be of determinative significance in the case at bar. Here the United States resorted to the District Court for vindication of its right under a formal contract, said to be operative "for the period of Government possession" and mutually adopted by the parties concerned as a satisfactory solution to a grave situation. The District Court, to

parable action transpired in the House. Indeed, proposals in the House and the House substitute [44] for S. 796 authorized the use of injunctions in connection with private plants not yet seized by the United States. These admitted inroads on the Norris-LaGuardia Act drew much comment [45] on the floor of the House, but nevertheless prevailed. Seizure was also contemplated, and criminal sanctions were made available in this situation, without specifically authorizing the use of injunctions by the United States. The latter issue was not raised, not debated and not commented upon in the House. But the fact that the House version did not provide for the issuance of injunctions to aid in the operation of seized plants is not the issue here. Rather, it is whether the House expressed any intent to restrict the existing authority of the courts. We find not the slightest suggestion to that effect in either the House substitute bill or the debates concerning it.

Nor can the action of the conference committee be construed as a Congressional proscription of issuing injunctions to aid the United States in dealing with employees in seized plants. Neither the House nor Senate version, as these bills went to conference, in any way placed this issue before the conferees. The conference committee simply struck the broader provisions of the House bill allowing injunctions to issue in private labor disputes and

---

preserve existing conditions, issued a restraining order and a preliminary injunction, effective until contractual rights could be ascertained. True, the action of the defendant Lewis in calling a strike, in addition to terminating the contract, suggests a violation of § 6 of the War Labor Disputes Act. But Senate disapproval of using injunctions to avert the latter event does not necessarily imply a desire to diminish the contractual rights and remedies of the United States.

[44] 89 Cong. Rec. 5382.

[45] See, for example, 89 Cong. Rec. 5241, 5243, 5299, 5305, 5321, 5325.

had no occasion to consider the narrower question we have before us now. The conferees, in producing the Act in its final form, did nothing which suggests that the Congress intended to bar injunctions sought by the Government to aid in the operation of seized plants. We thus find nothing in the legislative background of the War Labor Disputes Act which constitutes an authoritative expression of Congress directing the courts to withhold from the United States injunctive relief in connection with an Act designed to strengthen the hand of the Government in serious labor disputes.

The defendants contend, however, that workers in mines seized by the Government are not employees of the Federal Government; that in operating the mines thus seized, the Government is not engaged in a sovereign function; and that, consequently, the situation in this case does not fall within the area which we have indicated as lying outside the scope of the Norris-LaGuardia Act. It is clear, however, that workers in the mines seized by the Government under the authority of the War Labor Disputes Act stand in an entirely different relationship to the Federal Government with respect to their employment from that which existed before the seizure was effected. That Congress intended such to be the case is apparent both from the terms of the statute and from the legislative deliberations preceding its enactment. Section 3 of the War Labor Disputes Act calls for the seizure of any plant, mine, or facility when the President finds that the operation thereof is threatened by strike or other labor disturbance and that an interruption in production will unduly impede the war effort. Congress intended that by virtue of Government seizure, a mine should become, for purposes of production and operation, a Government facility in as complete a sense as if the Government held full

title and ownership.[46]   Consistently with that view, criminal penalties were provided for interference with the operation of such facilities.[47]   Also included were procedures for adjusting wages and conditions of employment of the workers in such a manner as to avoid interruptions in production.[48]   The question with which we are confronted is not whether the workers in mines under Government seizure are "employees" of the Federal Government for every purpose which might be conceived,[49] but whether,

---

[46] Thus in the legislative debates Senator Connally stated: ". . . but it does seem to me that the power and authority and sovereignty of the Government of the United States are so comprehensive that when we are engaged in war and a plant is not producing, we can take it over, and that when we do take it over, it is a Government plant, just as much as if we had a fee simple title to it, . . ." 89 Cong. Rec. 3811–3812.   See also id. at 3809, 3884–3885, 5722.

[47] War Labor Disputes Act, § 6, provided:

"(a) Whenever any plant, mine, or facility is in the possession of the United States, it shall be unlawful for any person (1) to coerce, instigate, induce, conspire with, or encourage any person, to interfere, by lock-out, strike, slow-down, or other interruption, with the operation of such plant, mine, or facility, or (2) to aid any such lock-out, strike, slow-down, or other interruption interfering with the operation of such plant, mine, or facility by giving direction or guidance in the conduct of such interruption, or by providing funds for the conduct or direction thereof or for the payment of strike, unemployment, or other benefits to those participating therein.   No individual shall be deemed to have violated the provisions of this section by reason only of his having ceased work or having refused to continue to work or to accept employment.

"(b) Any person who willfully violates any provision of this section shall be subject to a fine of not more than $5,000, or to imprisonment for not more than one year, or both."

[48] Id., § 5.

[49] Thus according to § 23 of the Revised Regulations for the Operation of the Coal Mines Under Government Control, issued by the Coal Mines Administrator on July 8, 1946: ". . . nothing in these regulations shall be construed as recognizing such personnel as officers and employees of the Federal Government within the meaning of the

for the purposes of this case, the incidents of the relationship existing between the Government and the workers are those of governmental employer and employee.

Executive Order 9728, in pursuance of which the Government seized possession of the mines, authorized the Secretary of the Interior to negotiate with the representatives of the miners, and thereafter to apply to the National Wage Stabilization Board for appropriate changes in terms and conditions of employment for the period of governmental operation.[50] Such negotiations were undertaken and resulted in the Krug-Lewis agreement. That agreement contains many basic departures from the earlier contract entered into between the mine workers and the private operators on April 11, 1945, which, except as amended and supplemented by the Krug-Lewis agreement, was continued in effect for the period of Government possession. Among the terms of the Krug-Lewis agreement were provisions for a new mine safety code. Operating managers were directed to provide the mine employees with the protection and benefits of Workmen's Compensation and Occupational Disease Laws. Provision was made for a Welfare and Retirement Fund and a Medical and Hospital Fund. The agreement granted substantial wage increases and contained terms relating to vacations and vacation pay. Included were provisions calling for changes in equitable grievance procedures.

It should be observed that the Krug-Lewis agreement was one solely between the Government and the union.

---

statutes relating to Federal employment." And see § 16. Section 23 also provides, however: "All personnel of the mines, both officers and employees, shall be considered as called upon by Executive Order No. 9728, to serve the Government of the United States . . . ."

[50] After the negotiation of the Krug-Lewis agreement, the changes agreed upon therein were approved by the National Wage Stabilization Act and thereafter by the President. This procedure is provided for in § 5 of the War Labor Disputes Act.

The private mine operators were not parties to the contract nor were they made parties to any of its subsequent modifications. It should also be observed that the provisions relate to matters which normally constitute the subject matter of collective bargaining between employer and employee. Many of the provisions incorporated into the agreement for the period of Government operation had theretofore been vigorously opposed by the private operators and have not subsequently received their approval.

It is descriptive of the situation to state that the Government, in order to maintain production and to accomplish the purposes of the seizure, has substituted itself for the private employer in dealing with those matters which formerly were the subject of collective bargaining between the union and the operators. The defendants by their conduct have given practical recognition to this fact. The union negotiated a collective agreement with the Government and has made use of the procedures provided by the War Labor Disputes Act to modify its terms and conditions. The union has apparently regarded the Krug-Lewis agreement as a sufficient contract of employment to satisfy the mine workers' traditional demand of a contract as a condition precedent to their work. The defendant Lewis, in responding to a suggestion of the Secretary of the Interior that certain union demands should be taken to the private operators with the view of making possible the termination of Government possession, stated in a letter dated November 15, 1946: "The Government of the United States seized the mines and entered into a contract. The mine workers do not propose to deal with parties who have no status under that contract." The defendant Lewis in the same letter referred to the operators as "strangers to the Krug-Lewis Agreement" and to the miners as the "400,000 men who now serve the Government of the United States in the bituminous coal mines."

The defendants, however, point to the fact that the private managers of the mines have been retained by the Government in the role of operating managers with substantially the same functions and authority. It is true that the regulations for the operation of the mines issued by the Coal Mines Administrator provide for the retention of the private managers to assist in the realization of the objects of Government seizure and operation.[51] The regulations, however, also provide for the removal of such operating managers at the discretion of the Coal Mines Administrator.[52] Thus the Government, though utilizing the services of the private managers, has nevertheless retained ultimate control.

The defendants also point to the regulations which provide that none of the earnings or liabilities resulting from the operation of the mines, while under seizure, are for the account or at the risk or expense of the Government;[53] that the companies continue to be liable for all Federal, State, and local taxes;[54] and that the mining companies remain subject to suit.[55] The regulations on which defendants rely represent an attempt on the part of the Coal Mines Administrator to define the respective powers and obligations of the Government and private operators during the period of Government control. We do not at this time express any opinion as to the validity of these regulations. It is sufficient to state that, in any event, the matters to which they refer have little persuasive weight in determining the nature of the relation existing between the Government and the mine workers.

---

[51] Revised Regulations for the Operation of the Coal Mines under Government Control, § 15.

[52] Regulations, §§ 16, 31.

[53] Regulations, §§ 17, 40.

[54] Regulations, § 24.

[55] *Ibid.*

We do not find convincing the contention of the defendants that in seizing and operating the coal mines the Government was not exercising a sovereign function and that, hence, this is not a situation which can be excluded from the terms of the Norris-LaGuardia Act. In the Executive Order which directed the seizure of the mines, the President found and proclaimed that "the coal produced by such mines is required for the war effort and is indispensable for the continued operation of the national economy during the transition from war to peace; that the war effort will be unduly impeded or delayed by . . . interruptions [in production]; and that the exercise . . . of the powers vested in me is necessary to insure the operation of such mines in the interest of the war effort and to preserve the national economic structure in the present emergency . . . ." Under the conditions found by the President to exist, it would be difficult to conceive of a more vital and urgent function of the Government than the seizure and operation of the bituminous coal mines. We hold that in a case such as this, where the Government has seized actual possession of the mines, or other facilities, and is operating them, and the relationship between the Government and the workers is that of employer and employee, the Norris-LaGuardia Act does not apply.

II.

Although we have held that the Norris-LaGuardia Act did not render injunctive relief beyond the jurisdiction of the District Court, there are alternative grounds which support the power of the District Court to punish violations of its orders as criminal contempt.

Attention must be directed to the situation obtaining on November 18. The Government's complaint sought a declaratory judgment in respect to the right of the de-

fendants to terminate the contract by unilateral action. What amounted to a strike call, effective at midnight on November 20, had been issued by the defendant Lewis as an "official notice." Pending a determination of defendants' right to take this action, the Government requested a temporary restraining order and injunctive relief. The memorandum in support of the restraining order seriously urged the inapplicability of the Norris-LaGuardia Act to the facts of this case, and the power of the District Court to grant the ancillary relief depended in great part upon the resolution of this jurisdictional question. In these circumstances, the District Court unquestionably had the power to issue a restraining order for the purpose of preserving existing conditions pending a decision upon its own jurisdiction.

The temporary restraining order was served on November 18. This was roughly two and one-half days before the strike was to begin. The defendants filed no motion to vacate the order. Rather, they ignored it, and allowed a nationwide coal strike to become an accomplished fact. This Court has used unequivocal language in condemning such conduct,[56] and has in *United States* v. *Shipp,* 203 U. S. 563 (1906), provided protection for judicial authority in situations of this kind. In that case this Court had allowed an appeal from a denial of a writ of *habeas corpus* by the Circuit Court of Tennessee. The petition had been filed by Johnson, then confined under a sentence of death imposed by a state court. Pending the appeal, this Court issued an order staying all proceedings against

---

[56] "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery." *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 450 (1911).

Johnson. However, the prisoner was taken from jail and lynched. Shipp, the sheriff having custody of Johnson, was charged with conspiring with others for the purpose of lynching Johnson, with intent to show contempt for the order of this Court. Shipp denied the jurisdiction of this Court to punish for contempt on the ground that the stay order was issued pending an appeal over which this Court had no jurisdiction because the constitutional questions alleged were frivolous and only a pretense. The Court, through Mr. Justice Holmes, rejected the contention as to want of jurisdiction, and in ordering the contempt to be tried, stated:

"We regard this argument as unsound. It has been held, it is true, that orders made by a court having no jurisdiction to make them may be disregarded without liability to process for contempt. *In re Sawyer,* 124 U. S. 200; *Ex parte Fisk,* 113 U. S. 713; *Ex parte Rowland,* 104 U. S. 604. But even if the Circuit Court had no jurisdiction to entertain Johnson's petition, and if this court had no jurisdiction of the appeal, this court, and this court alone, could decide that such was the law. It and it alone necessarily had jurisdiction to decide whether the case was properly before it. On that question, at least, it was its duty to permit argument and to take the time required for such consideration as it might need. See *Mansfield, Coldwater & Lake Michigan Ry. Co.* v. *Swan,* 111 U. S. 379, 387. Until its judgment declining jurisdiction should be announced, it had authority from the necessity of the case to make orders to preserve the existing conditions and the subject of the petition, just as the state court was bound to refrain from further proceedings until the same time. Rev. Stat. § 766; act of March 3, 1893, c. 226, 27 Stat. 751. The fact that the petitioner was entitled to argue his

case shows what needs no proof, that the law contemplates the possibility of a decision either way, and therefore must provide for it." 203 U. S. 573.

If this Court did not have jurisdiction to hear the appeal in the *Shipp* case, its order would have had to be vacated. But it was ruled that only the Court itself could determine that question of law. Until it was found that the Court had no jurisdiction, ". . . it had authority from the necessity of the case to make orders to preserve the existing conditions and the subject of the petition . . . ."

Application of the rule laid down in *United States* v. *Shipp, supra,* is apparent in *Carter* v. *United States,* 135 F. 2d 858 (1943). There a district court, after making the findings required by the Norris-LaGuardia Act, issued a temporary restraining order. An injunction followed after a hearing in which the court affirmatively decided that it had jurisdiction and overruled the defendants' objections based upon the absence of diversity and the absence of a case arising under a statute of the United States. These objections of the defendants prevailed on appeal, and the injunction was set aside. *Brown* v. *Coumanis,* 135 F. 2d 163 (1943). But in *Carter,* a companion case, violations of the temporary restraining order were held punishable as criminal contempt. Pending a decision on a doubtful question of jurisdiction, the District Court was held to have power to maintain the *status quo* and punish violations as contempt.[57]

---

[57] "It cannot now be broadly asserted that a judgment is always a nullity if jurisdiction of some sort or other is wanting. It is now held that, except in case of plain usurpation, a court has jurisdiction to determine its own jurisdiction, and if it be contested and on due hearing it is upheld, the decision unreversed binds the parties as a thing adjudged. Treinies v. Sunshine Mining Co., 308 U. S. 66, 60 S. Ct. 44, 84 L. Ed. 85; Sunshine Anthracite Coal Co. v. Adkins, 310 U. S. 381, 403, 60 S. Ct. 907, 84 L. Ed. 1263; Stoll v. Gottlieb, 305 U. S. 165, 59 S. Ct. 134, 83 L. Ed. 104. So in the matter of federal

In the case before us, the District Court had the power to preserve existing conditions while it was determining its own authority to grant injunctive relief. The defendants, in making their private determination of the law, acted at their peril. Their disobedience is punishable as criminal contempt.

Although a different result would follow were the question of jurisdiction frivolous and not substantial, such contention would be idle here. The applicability of the Norris-LaGuardia Act to the United States in a case such as this had not previously received judicial consideration, and both the language of the Act and its legislative history indicated the substantial nature of the problem with which the District Court was faced.

Proceeding further, we find impressive authority for the proposition that an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.[58] This is true without regard even for the constitutionality of the Act under which the order is issued. In *Howat* v. *Kansas,* 258 U. S. 181, 189–90 (1922) this Court said:

> "An injunction duly issuing out of a court of general jurisdiction with equity powers upon pleadings properly invoking its action, and served upon persons made parties therein and within the jurisdiction, must

jurisdiction, which is often a close question, the federal court may either have to determine the facts, as in contested citizenship, or the law, as whether the case alleged arises under a law of the United States."

[58] *Howat* v. *Kansas,* 258 U. S. 181 (1922); *Russell* v. *United States,* 86 F. 2d 389 (1936); *Locke* v. *United States,* 75 F. 2d 157 (1935); *O'Hearne* v. *United States,* 62 App. D. C. 285, 66 F. 2d 933 (1933); *Schwartz* v. *United States,* 217 F. 866 (1914); *Brougham* v. *Oceanic Steam Navigation Co.,* 205 F. 857 (1913); *Blake* v. *Nesbet,* 144 F. 279 (1905); see *Alemite Mfg. Corp.* v. *Staff,* 42 F. 2d 832, 833 (1930).

be obeyed by them however erroneous the action of the court may be, even if the error be in the assumption of the validity of a seeming but void law going to the merits of the case. It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished." [59]

Violations of an order are punishable as criminal contempt even though the order is set aside on appeal, *Worden* v. *Searls,* 121 U. S. 14 (1887),[60] or though the basic action has become moot, *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418 (1911).

We insist upon the same duty of obedience where, as here, the subject matter of the suit, as well as the parties, was properly before the court; where the elements of federal jurisdiction were clearly shown; and where the authority of the court of first instance to issue an order ancillary to the main suit depended upon a statute, the scope and applicability of which were subject to substantial doubt. The District Court on November 29 affirmatively decided that the Norris-LaGuardia Act was of no force in this case and that injunctive relief was therefore authorized. Orders outstanding or issued after that date were to be obeyed until they expired or were set aside by appropriate proceedings, appellate or otherwise. Convictions for criminal contempt intervening before that time may stand.

It does not follow, of course, that simply because a defendant may be punished for criminal contempt for dis-

---

[59] See *Alemite Mfg. Corp.* v. *Staff,* 42 F. 2d 832, 833 (1930).

[60] See *Salvage Process Corp.* v. *Acme Tank Cleaning Process Corp.,* 86 F. 2d 727 (1936).

obedience of an order later set aside on appeal, that the plaintiff in the action may profit by way of a fine imposed in a simultaneous proceeding for civil contempt based upon a violation of the same order. The right to remedial relief falls with an injunction which events prove was erroneously issued, *Worden* v. *Searls, supra,* at 25, 26; *Salvage Process Corp.* v. *Acme Tank Cleaning Process Corp.,* 86 F. 2d 727 (1936); *S. Anargyros* v. *Anargyros & Co.,* 191 F. 208 (1911); [61] and *a fortiori* when the injunction or restraining order was beyond the jurisdiction of the court. Nor does the reason underlying *United States* v. *Shipp, supra,* compel a different result. If the Norris-LaGuardia Act were applicable in this case, the conviction for civil contempt would be reversed in its entirety.

Assuming, then, that the Norris-LaGuardia Act applied to this case and prohibited injunctive relief at the request of the United States, we would set aside the preliminary injunction of December 4 and the judgment for civil contempt; but we would, subject to any infirmities in the contempt proceedings or in the fines imposed, affirm the judgments for criminal contempt as validly punishing violations of an order then outstanding and unreversed.

## III.

The defendants have pressed upon us the procedural aspects of their trial and allege error so prejudicial as to require reversal of the judgments for civil and criminal contempt. But we have not been persuaded.

---

[61] See *Leman* v. *Krentler-Arnold Co.,* 284 U. S. 448, 453 (1932); *Bessette* v. *W. B. Conkey Co.,* 194 U. S. 324, 329 (1904); *McCann* v. *New York Stock Exchange,* 80 F. 2d 211, 214 (1935). In accord in the case of settlement is *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 451–2 (1911): ". . . when the main cause was terminated . . . between the parties, the complainant did not require and was not entitled to any compensation or relief of any other character."

The question is whether the proceedings will support judgments for both criminal and civil contempt; and our attention is directed to Rule 42 (b) of the Rules of Criminal Procedure.[62] The rule requires criminal contempt to be prosecuted on notice stating the essential facts constituting the contempt charged. In this respect, there was compliance with the rule here. Notice was given by a rule to show cause served upon defendants together with the Government's petition and supporting affidavit. The pleadings rested only upon information and belief, but Rule 42 (b) was not designed to cast doubt upon the propriety of instituting criminal contempt proceedings in this manner.[63] The petition itself charged a violation of the outstanding restraining order, and the affidavit alleged in detail a failure to withdraw the notice of November 15, the cessation of work in the mines, and the consequent

---

[62] 18 U. S. C. A. following § 687. Rule 42 (b) regulates various aspects of a proceeding for criminal contempt where the contempt is not committed in the actual presence of the court:

"DISPOSITION UPON NOTICE AND HEARING. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment."

[63] *Conley* v. *United States*, 59 F. 2d 929 (1932); *Kelly* v. *United States*, 250 F. 947 (1918); see *National Labor Relations Board* v. *Arcade-Sunshine Co.*, 74 App. D. C. 361, 362, 122 F. 2d 964, 965 (1941).

interference with governmental functions and the jurisdiction of the court. The defendants were fairly and completely apprised of the events and conduct constituting the contempt charged.

However, Rule 42 (b) requires that the notice issuing to the defendants describe the criminal contempt charged as such. The defendants urge a failure to comply with this rule. The petition alleged a willful violation of the restraining order, and both the petition and the rule to show cause inquired as to why the defendants should not be "punished as and for a contempt" of court. But nowhere was the contempt described as criminal as required by the rule.

Nevertheless, the defendants were quite aware that a criminal contempt was charged.[64] In their motion to discharge and vacate the rule to show cause, the contempt charged was referred to as criminal.[65] And in argument on the motion the defendants stated and were expressly informed that a criminal contempt was to be tried. Yet it is now urged that the omission of the words "criminal contempt" from the petition and rule to show cause was prejudicial error. Rule 42 (b) requires no such rigorous appli-

---

[64] It could be well argued that the use of the word "punished" in the petition and rule to show cause was in itself adequate notice, for "punishment" has been said to be the magic word indicating a proceeding in criminal, rather than civil, contempt. Moskovitz, *Contempt of Injunctions, Civil and Criminal,* 43 Col. L. Rev. 780, 789–90 (1943). But "punishment" as used in contempt cases is ambiguous. "It is not the fact of punishment but rather its character and purpose . . . ." *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 441 (1941).

Noteworthy also is the allegation in the affidavit that the defendants' violation of the restraining order had "interfered with this Court's jurisdiction." And the charge in the petition of "wilfully . . . and deliberately" disobeying the restraining order indicates an intention to prosecute criminal contempt.

[65] See point 4, note 14, *supra.* The points and authorities in support of the motion used similar language.

cation, for it was designed to insure a realization by contemnors that a prosecution for criminal contempt is contemplated.[66] Its purpose was sufficiently fulfilled here, for this failure to observe the rule in all respects has not resulted in substantial prejudice to the defendants.

Not only were the defendants fully informed that a criminal contempt was charged, but we think they enjoyed during the trial itself all the enhanced protections accorded defendants in criminal contempt proceedings.[67] We need not treat these at length, for defendants, in this respect, urge only their right to a jury trial as provided in § 11 of the Norris-LaGuardia Act. But § 11 is not operative here, for it applies only to cases "arising under this Act," [68] and we have already held that the restriction upon injunctions imposed by the Act do not govern this case.[69] The defendants, we think, were properly tried by the court without a jury.

If the defendants were thus accorded all the rights and privileges owing to defendants in criminal contempt cases, they are put in no better position to complain because their trial included a proceeding in civil contempt and was carried on in the main equity suit. Common

---

[66] The rule in this respect follows the suggestion made in *McCann* v. *New York Stock Exchange,* 80 F. 2d 211, 214–215 (1935). Notes to the Rules of Criminal Procedure, Advisory Committee, March, 1945, p. 34.

[67] *Cooke* v. *United States,* 267 U. S. 517, 537 (1925); see *Michaelson* v. *United States,* 266 U. S. 42, 66–67 (1924).

[68] Section 11 provides in part: "In all cases arising under this Act in which a person shall be charged with contempt in a court of the United States (as herein defined), the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the contempt shall have been committed . . . ."

[69] We believe, and the Government admits, that the defendants would have been entitled to a jury trial if § 11 applied to the instant contempt proceeding and if this case arose under the Norris-LaGuardia Act.

sense would recognize that conduct can amount to both civil and criminal contempt. The same acts may justify a court in resorting to coercive and to punitive measures.[70] Disposing of both aspects of the contempt in a single proceeding would seem at least a convenient practice. Litigation in patent cases has frequently followed this course,[71] and the same method can be noted in other situations in both federal and state courts.[72] Rule 42 (b), while demanding fair notice and recognition of the criminal aspects of the case, contains nothing precluding a simultaneous disposition of the remedial aspects of the contempt tried. Even if it be the better practice to try criminal contempt alone and so avoid obscuring the defendant's privileges in any manner, a

---

[70] "It may not be always easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both." *Bessette* v. *W. B. Conkey Co.*, 194 U. S. 324, 329 (1904). See *Lamb* v. *Cramer*, 285 U. S. 217, 221 (1932); *Merchants' Stock & Grain Co.* v. *Board of Trade of Chicago*, 201 F. 20, 24 (1912).

[71] "In patent cases it has been usual to embrace in one proceeding the public and the private remedy—to punish the defendant if found worthy of punishment, and, at the same time, or as an alternative, to assess damages and costs for the benefit of the plaintiff . . . ." *Hendryx* v. *Fitzpatrick*, 19 F. 810, 813 (1884). Examples of this procedure appear in *Union Tool Co.* v. *Wilson*, 259 U. S. 107 (1922); *Matter of Christensen Engineering Co.*, 194 U. S. 458 (1904); *Wilson* v. *Byron Jackson Co.*, 93 F. 2d 577 (1937); *Kreplik* v. *Couch Patents Co.*, 190 F. 565 (1911).

[72] *Farmers National Bank* v. *Wilkinson*, 266 U. S. 503 (1925); *In re Swan*, 150 U. S. 637 (1893); *In re Ayers*, 123 U. S. 443 (1887); *Merchants' Stock & Grain Co.* v. *Board of Trade of Chicago*, 201 F. 20 (1912). See *Phillips Sheet & Tin Plate Co.* v. *Amalgamated Assn. of Iron & Tin Workers*, 208 F. 335, 340 (1913). Instances in the state courts include *Carey* v. *District Court of Jasper County*, 226 Iowa 717, 285 N. W. 236 (1939); *Holloway* v. *Peoples Water Co.*, 100 Kan. 414, 167 P. 265 (1917); *Grand Lodge, K. P. of New Jersey* v. *Jansen*, 62 N. J. Eq. 737, 48 A. 526 (1901).

mingling of civil and criminal contempt proceedings must nevertheless be shown to result in substantial prejudice before a reversal will be required.[73]   That the contempt proceeding carried the number and name of the equity suit [74] does not alter this conclusion, especially where, as here, the United States would have been the complaining party in whatever suit the contempt was tried.   In so far as the criminal nature of the double proceeding domi-

---

[73] We are not impressed with defendants' attack on the pleadings as insufficient to support a judgment for civil contempt.   The petition, affidavit, and rule to show cause did not expressly mention civil contempt or remedial relief, but the affidavit contained allegations of interference with the operation of the mines and with governmental functions.   These claims do not negative remedial or coercive relief. More significantly, the affidavit charged disobedience of the restraining order by failing to withdraw the notice of Nov. 15.   We will not assume that the defendants were not instantly aware that a usual remedy in such a situation is to impose coercive sanctions until the act is performed.   This is a function of civil contempt.   *Lamb* v. *Cramer*, 285 U. S. 217, 221 (1932); *Michaelson* v. *United States*, 266 U. S. 42, 66 (1924); *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 449 (1911).   Furthermore, defendants' counsel, in argument on the motion to vacate, remarked that the United States was proceeding upon the theory of civil contempt, and attempted only to demonstrate the inability of the United States to seek this relief.   And when the Government's suggestions for fines were before the court, defendants' counsel argued the excessiveness of the fines for either civil or criminal contempt.

[74] Criminal contempt was apparently tried out in the equity suit in the patent cases in note 71 *supra*.   And this was the practice followed in *Matter of Christensen Engineering Co.*, 194 U. S. 458 (1904); *Bessette* v. *W. B. Conkey Co.*, 194 U. S. 324 (1904); *New Orleans* v. *Steamship Co.*, 20 Wall. 387 (1874).   In none of these cases in this Court, however, has there been an affirmative discussion of the propriety of proceeding in this manner.   Compare *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 445 (1911); *United States* v. *Bittner*, 11 F. 2d 93, 95 (1926), with *Nye* v. *United States*, 313 U. S. 33, 42 (1941).

nates [75] and in so far as the defendants' rights in the criminal trial are not diluted by the mixing of civil with criminal contempt, to that extent is prejudice avoided.[76] Here, as we have indicated, all rights and privileges of the defendants were fully respected, and there has been no showing of substantial prejudice flowing from the formal peculiarities of defendants' trial.

Lastly, the defendants have assigned as error and argued in their brief that the District Court improperly extended the restraining order on November 27 for another ten days. There was then in progress argument on defendants' motion to vacate the rule to show cause, a part of the contempt proceedings. In the circumstances of this case, we think there was good cause shown for extending the order.[77]

## IV.

Apart from their contentions concerning the formal aspects of the proceedings below, defendants insist upon the inability of the United States to secure relief by way

[75] Cf. *Nye* v. *United States,* 313 U. S. 33, 42 (1941); *Union Tool Co.* v. *Wilson,* 259 U. S. 107, 110 (1922); *In re Merchants' Stock & Grain Co.,* 223 U. S. 639, 642 (1912); *Matter of Christensen Engineering Co.,* 194 U. S. 458, 461 (1904).

[76] In *Federal Trade Commission* v. *A. McLean & Son,* 94 F. 2d 802 (1938), it could not be said that the criminal element had been dominant and clear from the very outset of the case. The same is true of *Norstrom* v. *Wahl,* 41 F. 2d 910 (1930).

[77] Rule 65 (b) of the Federal Rules of Civil Procedure provides that a temporary restraining order should expire according to its terms "unless within the time so fixed the order, for good cause shown, is extended for a like period . . ." There being sufficient cause for the extension, there is no conflict with the subsequent clause of Rule 65 (b) requiring that "the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character . . . ." 308 U. S. 744.

of civil contempt in this case, and would limit the right to proceed by civil contempt to situations in which the United States is enforcing a statute expressly allowing resort to the courts for enforcement of statutory orders. *McCrone* v. *United States*, 307 U. S. 61 (1939), however, rests upon no such narrow ground, for the Court there said that "Article 3, § 2, of the Constitution, expressly contemplates the United States as a party to civil proceedings by extending the jurisdiction of the federal judiciary 'to Controversies to which the United States shall be a Party.'" *Id.* at 63. The United States was fully entitled to bring the present suit and to benefit from orders entered in its behalf.[78] We will not reduce the practical value of the relief granted by limiting the United States, when the orders have been disobeyed, to a proceeding in criminal contempt, and by denying to the Government the civil remedies enjoyed by other litigants, including the opportunity to demonstrate that disobedience has occasioned loss.[79]

## V.

It is urged that, in any event, the amount of the fine of $10,000 imposed on the defendant Lewis and of the fine of $3,500,000 imposed on the defendant Union were arbitrary, excessive, and in no way related to the evidence adduced at the hearing.

Sentences for criminal contempt are punitive in their nature and are imposed for the purpose of vindicating the authority of the court. *Gompers* v. *Bucks Stove & Range*

---

[78] Section 24 of the Judicial Code, 28 U. S. C. § 41, extends the jurisdiction of the District Courts to "all suits of a civil nature, at common law or in equity, brought by the United States . . . ."

[79] The Court in the *McCrone* case affirmed 100 F. 2d 322 and noted, 307 U. S. 61, 63, note 4, the conflict with *Federal Trade Commission* v. *A. McClean & Son*, 94 F. 2d 802, 804 (1938), upon which defendants now rely.

*Co., supra,* at 441. The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter. One who defies the public authority and willfully refuses his obedience, does so at his peril. In imposing a fine for criminal contempt, the trial judge may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future. Because of the nature of these standards, great reliance must be placed upon the discretion of the trial judge.

The trial court properly found the defendants guilty of criminal contempt. Such contempt had continued for 15 days from the issuance of the restraining order until the finding of guilty. Its willfulness had not been qualified by any concurrent attempt on defendants' part to challenge the order by motion to vacate or other appropriate procedures. Immediately following the finding of guilty, defendant Lewis stated openly in court that defendants would adhere to their policy of defiance. This policy, as the evidence showed, was the germ center of an economic paralysis which was rapidly extending itself from the bituminous coal mines into practically every other major industry of the United States. It was an attempt to repudiate and override the instrument of lawful government in the very situation in which governmental action was indispensable.

The trial court also properly found the defendants guilty of civil contempt. Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate

the complainant for losses sustained. *Gompers* v. *Bucks Stove & Range Co., supra,* at 448, 449. Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss,[80] and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy.[81]

But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.[82]

It is a corollary of the above principles that a court which has returned a conviction for contempt must, in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant.

In the light of these principles, we think the record clearly warrants a fine of $10,000 against defendant Lewis for criminal contempt. A majority of the Court, however, does not think that it warrants the unconditional imposition of a fine of $3,500,000 against the defendant union. A majority feels that, if the court below had assessed a fine of $700,000 against the defendant union, this, under the circumstances, would not be

---

[80] *Leman* v. *Krentler-Arnold Co.,* 284 U. S. 448, 455–456 (1932); *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 443–444 (1911); *Parker* v. *United States,* 126 F. 2d 370, 380 (1942); *Judelshon* v. *Black,* 64 F. 2d 116 (1933); *Norstrom* v. *Wahl,* 41 F. 2d 910, 914 (1930).

[81] See pp. 294–295 *supra.*

[82] Cf. *Doyle* v. *London Guarantee Co.,* 204 U. S. 599 (1907). See also *In re Chiles,* 22 Wall. 157, 168 (1874).

excessive as punishment for the criminal contempt theretofore committed; and feels that, in order to coerce the defendant union into a future compliance with the court's order, it would have been effective to make the other $2,800,000 of the fine conditional on the defendant's failure to purge itself within a reasonable time. Accordingly, the judgment against the defendant union is held to be excessive. It will be modified so as to require the defendant union to pay a fine of $700,000, and further, to pay an additional fine of $2,800,000 unless the defendant union, within five days after the issuance of the mandate herein, shows that it has fully complied with the temporary restraining order issued November 18, 1946, and the preliminary injunction issued December 4, 1946. The defendant union can effect full compliance only by withdrawing unconditionally the notice given by it, signed John L. Lewis, President, on November 15, 1946, to J. A. Krug, Secretary of the Interior, terminating the Krug-Lewis agreement as of twelve o'clock midnight, Wednesday, November 20, 1946, and by notifying, at the same time, its members of such withdrawal in substantially the same manner as the members of the defendant union were notified of the notice to the Secretary of the Interior above-mentioned; and by withdrawing and similarly instructing the members of the defendant union of the withdrawal of any other notice to the effect that the Krug-Lewis agreement is not in full force and effect until the final determination of the basic issues arising under the said agreement.

We well realize the serious proportions of the fines here imposed upon the defendant union. But a majority feels that the course taken by the union carried with it such a serious threat to orderly constitutional government, and to the economic and social welfare of the nation, that a fine of substantial size is required in order to emphasize the

gravity of the offense of which the union was found guilty. The defendant Lewis, it is true, was the aggressive leader in the studied and deliberate non-compliance with the order of the District Court; but, as the record shows, he stated in open court prior to imposition of the fines that "the representatives of the United Mine Workers determined that the so-called Krug-Lewis Agreement was breached," and that it was the union's "representatives" who "notified the Secretary of the Interior that the contract was terminated as of November 20th." And certainly it was the members of the defendant union who executed the nationwide strike. Loyalty in responding to the orders of their leader may, in some minds, minimize the gravity of the miners' conduct; but we cannot ignore the effect of their action upon the rights of other citizens, or the effect of their action upon our system of government. The gains, social and economic, which the miners and other citizens have realized in the past are ultimately due to the fact that they enjoy the rights of free men under our system of government. Upon the maintenance of that system depends all future progress to which they may justly aspire. In our complex society, there is a great variety of limited loyalties, but the overriding loyalty of all is to our country and to the institutions under which a particular interest may be pursued.

We are aware that the defendants may have sincerely believed that the restraining order was ineffective and would finally be vacated. However, the Government had sought a declaration of its contractual rights under the Krug-Lewis agreement, effective since May 29, 1946, and solemnly subscribed by the Government and the defendant union. The restraining order sought to preserve conditions until the cause could be determined, and obedience by the defendants would have secured this result. They had full opportunity to comply with the order of the District Court, but they deliberately refused obedience and

determined for themselves the validity of the order. When the rule to show cause was issued, provision was made for a hearing as to whether or not the alleged contempt was sufficiently purged. At that hearing the defendants stated to the court that their position remained then in the status which existed at the time of the issuance of the restraining order. Their conduct showed a total lack of respect for the judicial process. Punishment in this case is for that which the defendants had done prior to imposition of the judgment in the District Court, coupled with a coercive imposition upon the defendant union to compel obedience with the court's outstanding order.

We have examined the other contentions advanced by the defendants but have found them to be without merit. The temporary restraining order and the preliminary injunction were properly issued, and the actions of the District Court in these respects are affirmed. The judgment against the defendant Lewis is affirmed. The judgment against the defendant union is modified in accordance with this opinion, and, as modified, that judgment is affirmed.

*So ordered.*

MR. JUSTICE JACKSON joins in this opinion except as to the Norris-LaGuardia Act which he thinks relieved the courts of jurisdiction to issue injunctions in this class of case.

MR. JUSTICE FRANKFURTER, concurring in the judgment.

The historic phrase "a government of laws and not of men" epitomizes the distinguishing character of our political society. When John Adams put that phrase into the Massachusetts Declaration of Rights he was not indulging in a rhetorical flourish. He was expressing the aim

of those who, with him, framed the Declaration of Independence and founded the Republic. "A government of laws and not of men" was the rejection in positive terms of rule by fiat, whether by the fiat of governmental or private power. Every act of government may be challenged by an appeal to law, as finally pronounced by this Court. Even this Court has the last say only for a time. Being composed of fallible men, it may err. But revision of its errors must be by orderly process of law. The Court may be asked to reconsider its decisions, and this has been done successfully again and again throughout our history. Or, what this Court has deemed its duty to decide may be changed by legislation, as it often has been, and, on occasion, by constitutional amendment.

But from their own experience and their deep reading in history, the Founders knew that Law alone saves a society from being rent by internecine strife or ruled by mere brute power however disguised. "Civilization involves subjection òf force to reason, and the agency of this subjection is law." [1] The conception of a government by laws dominated the thoughts of those who founded this Nation and designed its Constitution, although they knew as well as the belittlers of the conception that laws have to be made, interpreted and enforced by men. To that end, they set apart a body of men, who were to be the depositories of law, who by their disciplined training and character and by withdrawal from the usual temptations of private interest may reasonably be expected to be "as free, impartial, and independent as the lot of humanity will admit." So strongly were the framers of the Constitution bent on securing a reign of law that they endowed the judicial office with extraordinary safeguards and prestige. No one, no matter how exalted his public office or how righteous

[1] Pound, *The Future of Law* (1937) 47 Yale L. J. 1, 13.

his private motive, can be judge in his own case. That is what courts are for. And no type of controversy is more peculiarly fit for judicial determination than a controversy that calls into question the power of a court to decide. Controversies over "jurisdiction" are apt to raise difficult technical problems. They usually involve judicial presuppositions, textual doubts, confused legislative history, and like factors hardly fit for final determination by the self-interest of a party.

Even when a statute deals with a relatively uncomplicated matter, and the "words in their natural sense as they would be read by the common man" would appear to give an obvious meaning, considerations underlying the statute have led this Court to conclude that "the words cannot be taken quite so simply." See *Milburn Co.* v. *Davis Co.*, 270 U. S. 390, 400. How much more true this is of legislation like the Norris-LaGuardia Act. This Act altered a long process of judicial history, but altered it by a scheme of complicated definitions and limitations.

The Government here invoked the aid of a court of equity in circumstances which certainly were not covered by the Act with inescapable clarity. Colloquially speaking, the Government was "running" the mines. But it was "running" them not as an employer, in the sense that the owners of the coal mines were the employers of the men the day before the Government seized the mines. Nor yet was the relation between the Government and the men like the relation of the Government to the civil service employees in the Department of the Interior. It would be naive or wilful to assert that the scope of the Norris-La Guardia Act in a situation like that presented by this bill raised a question so frivolous that any judge should have summarily thrown the Government out of court without day. Only when a court is so obviously traveling outside its orbit as to be merely usurping judicial forms and facilities, may an order issued by a

court be disobeyed and treated as though it were a letter to a newspaper.   Short of an indisputable want of authority on the part of a court, the very existence of a court presupposes its power to entertain a controversy, if only to decide, after deliberation, that it has no power over the particular controversy.   Whether a defendant may be brought to the bar of justice is not for the defendant himself to decide.

To be sure, an obvious limitation upon a court cannot be circumvented by a frivolous inquiry into the existence of a power that has unquestionably been withheld.   Thus, the explicit withdrawal from federal district courts of the power to issue injunctions in an ordinary labor dispute between a private employer and his employees cannot be defeated, and an existing right to strike thereby impaired, by pretending to entertain a suit for such an injunction in order to decide whether the court has jurisdiction.   In such a case, a judge would not be acting as a court.   He would be a pretender to, not a wielder of, judicial power.

That is not this case.   It required extended arguments, lengthy briefs, study and reflection preliminary to adequate discussion in conference, before final conclusions could be reached regarding the proper interpretation of the legislation controlling this case.   A majority of my brethren find that neither the Norris-LaGuardia Act nor the War Labor Disputes Act limited the power of the district court to issue the orders under review.   I have come to the contrary view.   But to suggest that the right to determine so complicated and novel an issue could not be brought within the cognizance of the district court, and eventually of this Court, is to deny the place of the judiciary in our scheme of government.   And if the district court had power to decide whether this case was properly before it, it could make appropriate orders so as to afford the necessary time for fair consideration and decision while

existing conditions were preserved. To say that the authority of the court may be flouted during the time necessary to decide is to reject the requirements of the judicial process.

It does not mitigate such defiance of law to urge that hard-won liberties of collective action by workers were at stake. The most prized liberties themselves presuppose an independent judiciary through which these liberties may be, as they often have been, vindicated. When in a real controversy, such as is now here, an appeal is made to law, the issue must be left to the judgment of courts and not the personal judgment of one of the parties. This principle is a postulate of our democracy.

And so I join the opinion of the Court insofar as it sustains the judgment for criminal contempt upon the broad ground of vindicating the process of law.[2] The records of this Court are full of cases, both civil and criminal, involving life or land or small sums of money, in which the Court proceeded to consider a federal claim that was not obviously frivolous. It retained such cases under its power until final judgment, though the claim eventually turned out to be unfounded and the judgment was one denying the jurisdiction either of this Court or of the court from which the case came. In the case before us, the District Court had power "to preserve the existing conditions" in the discharge of "its duty to permit argument and to take the time required for such consideration as it might need" to decide whether the controversy involved a labor dispute to which the Norris-LaGuardia Act applied. *United States* v. *Shipp,* 203 U. S. 563, 573, and *Howat* v. *Kansas,* 258 U. S. 181.

---

[2] Since, in my view, this was not a conviction for contempt in a case "arising under this Act," the jury provisions of § 11 of the Norris-LaGuardia Act do not apply. For obvious reasons, the petitioners do not claim that the Constitution of the United States affords them a right to trial by jury.

In our country law is not a body of technicalities in the keeping of specialists or in the service of any special interest. There can be no free society without law administered through an independent judiciary. If one man can be allowed to determine for himself what is law, every man can. That means first chaos, then tyranny. Legal process is an essential part of the democratic process. For legal process is subject to democratic control by defined, orderly ways which themselves are part of law. In a democracy, power implies responsibility. The greater the power that defies law the less tolerant can this Court be of defiance. As the Nation's ultimate judicial tribunal, this Court, beyond any other organ of society, is the trustee of law and charged with the duty of securing obedience to it.

It only remains to state the basis of my disagreement with the Court's views on the bearing of the Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. § 101, and the War Labor Disputes Act, 57 Stat. 163, 50 U. S. C. App. § 1501. As to the former, the Court relies essentially on a general doctrine excluding the Government from the operation of a statute in which it is not named, and on the legislative history of the Act. I find the countervailing considerations weightier. The Norris-LaGuardia Act deprived the federal courts of jurisdiction to issue injunctions in labor disputes except under conditions not here relevant. The question before a court of equity therefore is whether a case presents a labor dispute as defined by the Act. Section 13 (c) defines "labor disputes":

> "The term 'labor dispute' includes any controversy concerning terms or conditions of employment . . . regardless of whether or not the disputants stand in the proximate relation of employer and employee."

That the controversy before the district court comes within this definition does not need to be labored. The

controversy arising under the Lewis-Krug contract concerned "terms or conditions of employment" and was therefore a "labor dispute," whatever further radiations the dispute may have had. The Court deems it appropriate to interpolate an exception regarding labor disputes to which the Government is a party. It invokes a canon of construction according to which the Government is excluded from the operation of general statutes unless it is included by explicit language.

The Norris-LaGuardia Act has specific origins and definite purposes and should not be confined by an artificial canon of construction. The title of the Act gives its scope and purpose, and the terms of the Act justify its title. It is an Act "to define and limit the jurisdiction of courts sitting in equity." It does not deal with the rights of parties but with the power of the courts. Again and again the statute says "no court shall have jurisdiction," or an equivalent phrase. Congress was concerned with the withdrawal of power from the federal courts to issue injunctions in a defined class of cases. Nothing in the Act remotely hints that the withdrawal of this power turns on the character of the parties. The only reference to parties underscores their irrelevance to the issue of jurisdiction, for the power of the courts is withdrawn in a labor dispute "regardless of whether or not the disputants stand in the proximate relation of employer and employee." The limitation on the jurisdiction of the court depends entirely on the subject matter of the controversy. Section 13 (a) defines it:

> "A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; . . . ."

Neither the context nor the content of the Act qualifies the terms of that section. Did not the suit brought by the Government against Lewis and the United Mine Workers "grow out of a labor dispute" within the terms of § 13 (a)?

As already indicated, the Court now finds an exception to the limitation which the Norris-LaGuardia Act placed upon the equity jurisdiction of the district court, not in the Act but outside it. It invokes a canon of construction that a sovereign is presumptively not intended to be bound by its own statute unless named in it. At best, this canon, like other generalities about statutory construction, is not a rule of law. Whatever persuasiveness it may have in construing a particular statute derives from the subject matter and the terms of the enactment in its total environment. "This rule has its historical basis in the English doctrine that the Crown is unaffected by acts of Parliament not specifically directed against it. . . . The presumption is an aid to consistent construction of statutes of the enacting sovereign when their purpose is in doubt, but it does not require that the aim of a statute fairly to be inferred be disregarded because not explicitly stated." So wrote the late Chief Justice for the whole Court in *United States* v. *California,* 297 U. S. 175, 186, and this point of view was very recently applied in *United States* v. *Rice,* 327 U. S. 742, 749. It is one thing to read a statute so as not to bind the sovereign by restrictions, or to impose upon it duties, which are applicable to ordinary citizens. It is quite another to interpolate into a statute limiting the jurisdiction of a court, the qualification that such limitation does not apply when the Government invokes the jurisdiction. No decision of this Court gives countenance to such a doctrine of interpolation. The text, context, content and historical setting of the Norris-La-Guardia Act all converge to indicate the unrestricted withdrawal by Congress from the federal district courts of the

power to issue injunctions in labor disputes, excepting only under circumstances explicitly defined and not here present. The meaning which a reading of the text conveys and which is confirmed by the history which led Congress to free the federal courts from entanglements in these industrial controversies through use of the injunction, ought not to be subordinated to an abstract canon of construction that carries the residual flavor of the days when a personal sovereign was the law-maker.

Moreover, the rule proves too much. If the United States must explicitly be named to be affected, the limitations imposed by the Norris-LaGuardia Act upon the district court's jurisdiction could not deprive the United States of the remedies it theretofore had. Accordingly, the courts would not be limited in their jurisdiction when the United States is a party and the Act would not apply in any proceeding in which the United States is complainant. It would mean that, in order to protect the public interest, which may be jeopardized just as much whether an essential industry continued under private control or has been temporarily seized by the Government, a court could, at the behest of the Attorney General of the United States, issue an injunction as courts did when they issued the *Debs,* the *Hayes* and the *Railway Shopmen's* injunctions.[3] But it was these very injunctions, secured by the Attorney General of the United States under claim of compelling public emergency, that gave the most powerful momentum to the enactment of the Norris-LaGuardia Act. This history is too familiar to be rehearsed. It is surely surprising to conclude that when a long and persistent effort to take the federal courts out of the industrial conflict, insofar as the labor injunction put them into it, found its way to the statute books,

---

[3] *United States* v. *Debs,* 64 F. 724; 158 U. S. 564; *United States* v. *Hayes,* unreported, D. Ind. 1919; *United States* v. *Railway Employees' Dept. A. F. L.,* 283 F. 479, 286 F. 228, 290 F. 978.

the Act failed to meet the grievances that were most dramatic and deepest in the memory of those most concerned with the legislation.

It is urged, however, that legislative history cuts down what might otherwise be the scope of the Act. Reliance is placed on statements by two Representatives during the House debates on the Bill, calculated to show that Congress purposed to exclude from the limitation of the jurisdiction of the district courts labor disputes involving "employees" of the Government, at least where injunctions are sought by the Attorney General. Since both statements came from spokesmen for the Bill, they carry weight. The nature of these remarks, the circumstances under which they were delivered, as well as their setting, define their meaning and the significance to be given them as a gloss upon the Act.

There was before the House an Amendment by Representative Blanton which would have made the Act applicable "except where the United States Government is the petitioner." (75 Cong. Rec. 5503.) Representative LaGuardia opposed the Amendment, remarking "I do not see how in any possible way the United States can be brought in under the provisions of this bill." If this is to be read apart from the meaning afforded by the context of the debates and the whole course of the legislation, it would mean that the jurisdiction to grant a *Debs* injunction continued unaffected. No one would have been more startled by such a conclusion than Mr. LaGuardia. The fact is that a situation like the present, where the Government for a time has some relation to a labor dispute in an essentially private industry, was evidently not in the thought of Congress. Certainly it was not discussed. Mr. LaGuardia's statement regarding the position of the United States under the Act followed his reading of § 13 (b) under which a person is to be deemed interested in a labor dispute only if "engaged in the same industry, trade,

craft, or occupation in which such dispute occurs." His brief, elliptical remark plainly conveyed that the business of the Government of the United States is not an "industry, trade, craft, or occupation." This is made unequivocally clear by the colloquy that followed. Mr. Blanton inquired whether Mr. LaGuardia was willing "for the Army and the Navy to form a labor union and affiliate themselves with the American Federation of Labor and not permit the Government of the United States to preserve its rights?" The short answer for Mr. LaGuardia to have made was "The United States is not subject to the provisions of the Act, because by employer we mean a private employer." Instead of that, Mr. LaGuardia replied, "Oh, the Army and the Navy are not in a trade, craft, or occupation." In short, the scope of the limitation upon the jurisdiction of the courts depended not on party, but on subject matter. Representative Blanton's amendment was rejected by 125 to 21.

The second Representative upon whom the Court relies is Mr. Michener. He said, "Be it remembered that this bill does not attempt to legislate concerning Government employees. I do not believe that the enactment of this bill into law will take away from the Federal Government any rights which it has under existing law, to seek and obtain injunctive relief where the same is necessary for the functioning of the Government." (75 Cong. Rec. 5464.) Later he added ". . . This deals with labor disputes between individuals, not where the Government is involved. It is my notion that under this bill the Government can function with an injunction, if that is necessary in order to carry out the purpose of the Government. I should like to see this clarified, but I want to go on record as saying that under my interpretation of this bill the Federal Government will not at any time be prevented from applying for an injunction, if one is necessary in order that the Government may function." (*Id.* at 5509.) What Mr.

Michener gave as *his* interpretation of what survived the Norris-LaGuardia Act, was precisely the claim of the Government in asking for the *Debs* injunction. That injunction was sought and granted in order that the Government might function. Insofar, then, as Mr. Michener's statements imply that the United States could again get a *Debs* injunction, his understanding is belied by the whole history of the legislation, as reflected in its terms.[4] These statements can only mean, then, that if, say, employees in the Treasury Department had to be enjoined so that government could go on, it was Representative Michener's view that an injunction could issue. No attempt was made to make this view explicit in the Act. It was not discussed, and only one statement appears to share it.[5] In any event, it does not imply a broader exemption than that of which Representative LaGuardia spoke.

It is to be noted that the discussion in the House followed passage in the Senate of that which subsequently became the Act. It is a matter of history that the Senate Judiciary Committee was the drafting and driving force behind the Bill. The Bill had extended consideration by a subcommittee of the Senate Judiciary Committee followed by weighty reports and full discussion on the Senate floor. We are not pointed to a suggestion or a hint in the Senate proceedings that the withdrawal of jurisdiction to issue

---

[4] Compare Representative LaGuardia's reply to a proposed amendment by Representative Beck which would have exempted from the operation of the Act disputes "where the welfare, health, or lives of a public are concerned who are not parties to such labor dispute, or where a labor dispute involves the obstruction of any instrumentality of interstate or foreign commerce." Mr. LaGuardia claimed that the amendment was out of order because not germane to the purposes of the legislation. "The present bill refers only to disputes between employees and employer . . . The public is fully protected by penal and other statutes . . . ." 75 Cong. Rec. 5503.

[5] See statement of Representative Schneider, 75 Cong. Rec. 5514.

injunctions in labor disputes was subject to a latent exception as to injunctions sought by the Government.    The whole contemporaneous history is against it.    The experience which gave rise to the Norris-LaGuardia Act only underscores the unrestricted limitation upon the jurisdiction of the courts, except in situations of which this is not one.    To find implications in the fact that in the course of the debates it was not explicitly asserted that the district courts could not issue an injunction in a labor controversy even at the behest of the Government is to find the silence of Congress more revealing than the natural meaning of legislation and the history which begot it.    The remarks of Mr. LaGuardia and Mr. Michener ought not to be made the equivalent of writing an amendment into the Act.    It is one thing to draw on all relevant aids for shedding light on the dark places of a statute.    To allow inexplicit remarks in the give-and-take of debate to contradict the very terms of legislation and the history behind it is to put out the controlling light on meaning shed by the explicit provisions of an Act in its setting.

But even if we assume that the Act was not intended to apply to labor disputes involving "employees" of the United States, are the miners in the case before us "employees" of the United States within the meaning of this interpolated exception?    It can hardly be denied that the relation of the miners to the United States is a hybrid one. Clearly, they have a relation to the Government other than that of employees of plants not under Government operation.    Equally clearly, they have a relation and a status different from the relation and status of the clerks at the Treasury Department.    Never in the country's history have the terms of employment of the millions in Government service been established by collective bargaining. But the conditions of employment—hours, wages, holi-

days, vacations, health and welfare program, etc.—were
so fixed for the miners during the period of Government
seizure. The proper interpretation of this collective agree-
ment between the Government and the United Mine
Workers is precisely what is at the bottom of this contro-
versy. Neither a spontaneous nor a sophisticated char-
acterization would resort to the phrase "Government em-
ployees" without more, in speaking of the miners during
the operation of the mines by the Government. The only
concrete characterization of the status of employees in
seized plants was expressed by Under Secretary Patter-
son at a hearing on the predecessor bill to that which
became the law under which this seizure was made. He
spoke of the role of the Government as that of "A receiver
that would be charged with the continuity of operation of
the plant." [6] Nothing in the Acts authorizing seizure of

[6] Hearings on S. 2054 before a Subcommittee of the Committee on
the Judiciary, Senate, 77th Cong., 1st Sess., p. 14. The characteriza-
tion was accepted by members of the Committee which approved
the Bill. *Id.* at pp. 16, 18, 130. Senator Connally refers to the
private employer who "will continue to operate it under the super-
vision of the Government." *Id.* at 55. See also p. 57. While at
one point he referred to the United States as an employer (*id.* at 120),
he did so in a special context for the purposes of a discussion about
collective bargaining with reference to wages. As to wages, of course,
the Government would stand *in loco* "employer" during its operation
of the plant.

The analogy of equity receivership is not inapt. In a limited
sense, employees of plants in receivership in a federal court may be
considered employees of the United States, since the operation of the
plant is under the jurisdiction and control of a United States officer.
But no one aware of the background of mischief which the Act was
intended to remedy could find an intention in Congress to allow injunc-
tions in labor disputes involving plants in receivership. Compare
*Trainmen* v. *Toledo, P. & W. R. Co.,* 321 U. S. 50, 55, 58–61. No
series of cases contributed more to the feeling that the federal courts
abused their equity jurisdiction than those involving employees of

private plants indicates that the employees of these plants were to be considered employees of the United States in the usual and natural meaning of the term. In the full debates on bills providing for Government seizure of plants, Congressional leaders clearly indicated their understanding that as the law then stood there could be no injunctions in labor disputes in seized plants.[7]

But not only was such the understanding when the legal question emerged in the course of considering the need of war legislation. Recent legislation and its history

---

railroads in equity receivership. See, *e. g.*, 1 Gresham, Life of Walter Quintin Gresham, cc. XXIII to XXV; Gregory, Labor and the Law, 95–97; Nelles, *A Strike and Its Legal Consequences—An Examination of the Receivership Precedent for the Labor Injunction* (1931) 40 Yale L. J. 507, *passim*. If injunctions will not issue in disputes involving employees of railroads or other industries in receivership under operation by the federal courts, nothing relevant to the construction of the statute warrants the inference that Congress allowed the injunction to be available in disputes involving employees of plants in "receivership" under operation of the Secretary of the Interior.

[7] See especially the debates on a proposed amendment to the Smith-Connally Bill whereby Senator Connally sought to add the injunction as a remedy against violation of the Act.

"MR. CONNALLY. . . . The provision is limited to plants which the Government takes over. It would not change the Norris-LaGuardia Act in any respect, *except in the one particular case* . . .

.        .        .        .        .

"MR. LANGER. Mr. President, is it not true that unless section 5 is stricken from the bill that a portion of the Norris-LaGuardia Act will be repealed?

"MR. DANAHER. It would certainly be overridden; . . . ." (Emphasis supplied.)   89 Cong. Rec. 3988–89.

See also the statements of Senators Taft, Vandenberg, and Wagner, and compare those of Senators Revercomb and Barkley; and see the colloquy between Senators Connally and Vandenberg, *id*. at 3906, quoted *infra* note 10.

are relevant not merely because they show later understanding of the terms of an older statute. The War Labor Disputes Act of 1943 is directly and primarily involved in this case. The whole controversy arises under the authority to seize mines given by that Act. The real question before us is whether in authorizing such seizure and operation Congress also gave to the United States the right to prevent interference with its statutory operation through the equitable remedies here invoked.

By the War Labor Disputes Act, Congress created a new relationship among the Government, the plant owners, the employees. The rights, duties, remedies incident to that relation are those given by the Act. Congress naturally addressed itself to possible interferences with the Government's operation of seized plants. It dealt specifically with this subject. It gave the Government specific remedies which it might invoke against such interference.[8] Remedy by injunction was not given. It was not merely omitted. A fair reading of the legislative history shows that it was expressly and definitively denied. As reported out of the Senate Committee, S. 796 provided for plant seizure. It did not include the injunction among the remedies for interference with Government operation.[9] But when the Bill reached the floor of the Senate, Senator Connally, sponsor of the Bill, offered and urged an amendment giving the district courts jurisdiction to restrain violations of the measure.[10] He accepted, somewhat reluctantly, the

---

[8] 57 Stat. 163, 165–66, 50 U. S. C. App. § 1506 (b)'.

[9] S. Rep. No. 147, 78th Cong., 1st Sess.

[10] 89 Cong. Rec. 3809. And see p. 3906:

"Mr. VANDENBERG. . . .

"I am very anxious that there shall be additional statutory protection to the uninterrupted production of war necessities, but I am wondering whether in order to achieve that purpose it is necessary for

amendment of Senator Wagner to limit the proposed
amendment to an injunction at the behest of the Attorney

me to impinge upon a very profound hostility I have always had to
the use of injunctions in labor disputes. I voted for the original
Norris-LaGuardia Act, and I have always felt that one of the most
useful things we ever did, not only as a matter of fair play, but in
respect to the status of the courts was substantially to separate from
court jurisdiction the responsibility of, in effect, umpiring labor
disputes.

"What I wish to ask the able Senator from Texas, if I may, is this:
In his proposal, on page 4, it is provided that any person who will-
fully violates any provision of the act is to be guilty of a felony, and
subject to a fine or imprisonment. Is not that a conclusive penalty?
Is it necessary in addition to go back into all the old injunctive proc-
ess in connection with labor disputes?

"Mr. CONNALLY. That is not a legal inquiry really. Of course, it
might be that we could get along without the provision. Like the
Senator, I voted for the Norris-LaGuardia Act, and I favored the
policy embodied therein. This provision, however, applies only to
plants taken over by the Government. It seems to me that if the
Government is to operate a plant, it should have the widest and the
fullest authority to operate it as it wants to do and to prevent inter-
ruption. Therefore, because of the attitude of some who were inter-
ested in the bill, I inserted section 5. I do not think the bill would be
very seriously crippled if it were eliminated, but I think it is improved
by its remaining in. I do not think it would be fatal to strike out
that provision, but I hope that will not be done.

"Mr. VANDENBERG. I thank the Senator for his frank statement.
When the Government has taken over the operation of a plant and
it becomes in essence a Government operation, it is rather difficult to
resist the argument that the Government should not be deprived of
any instrumentality in the enforcement, virtually, of its sovereignty.

"Mr. CONNALLY. That is true.

"Mr. VANDENBERG. Nevertheless, I apprehend that the very fact
that the injunctive process is restored in the Senator's bill is the rea-
son why it appears in the additional amendment offered by the able
Senator from Ohio, where, it seems to me, it becomes decidedly more
offensive, using that word in the sense in which I have used it."

The reference is to an amendment proposed by Senator Taft

General, precisely as was here sought and granted.[11]   On motion of Senator Danaher, this proposal was rejected by the Senate after full debate,[12] participated in by Senators especially conversant with the history and scope of the existing remedies available to the Government.   With this remedy denied to the Government, the Bill was passed and sent to the House.[13]   The House did not like the Bill. Its version did not see fit specifically to add to the limited seizure provisions of the Selective Service Act of 1940, although apparently it assumed that there could be seizure under existing law in the case of failure by defense plants to produce as a result of labor troubles.   Instead, the House version provided stringent anti-strike and anti-lockout provisions as to plants in private operation, and by specific amendment to the Norris-LaGuardia Act the district courts were authorized to restrain violations of such provisions.   But this *pro tanto* repeal of the Norris-LaGuardia Act was not made available to the United States as a remedy against interference with operation of plants seized under the earlier, 1940 Act.[14]

The bill then went to conference.   What came out was, so far as here material, the bill that had passed the Senate. The United States was granted power to seize and oper-

---

authorizing injunctions in any circuit court of appeals at the request of the Attorney General in case of failure to obey orders of the War Labor Board, or whenever "operations are hindered or reduced by lock-out, strike, or otherwise."   This applied apparently to plants in private operation.   89 Cong. Rec. 3897–98.   Compare the Bill passed by the House, note 14.

[11] 89 Cong. Rec. 3907, 3988–89.

[12] *Id.* at 3989.

[13] *Id.* at 3993.

[14] Compare § 4 (b) and (c) with § 12 (a) and (b), 89 Cong. Rec. 5382–83.   For the earlier seizure provisions see 54 Stat. 885, 892, 50 U. S. C. App. § 309.

ate defense plants whose production was hampered by labor disputes. Specific remedies were formulated by Congress against interference with the Government's operation. The injunction was not included.[15] In neither house was further attempt made to reintroduce the Connally proposal giving the Government relief by injunction. Nor was it suggested that the Government had such redress under existing law. On the floor of the Senate, Senator Thomas of Utah, Chairman of the Committee on Education and Labor, said:

> "Mr. President, I ask the Senator from New Mexico [Mr. Hatch], the Senator from Connecticut [Mr. Danaher], and the Senator from Texas [Mr. Connally], the sponsor of the bill, whether there is a unanimous opinion on the part of those three great lawyers that there will not be a reopening of the district courts to industry-labor disputes? . . . I should like that point to be made so firmly and so strongly that no lawyer in the land who would like to take advantage of the situation created by the mere mention of the words 'district court' will resort to the court in order to confuse our industry-labor relations."

Mr. Connally answered:

> "Mr. President, . . . I think I speak for the Senator from Vermont and the Senator from New Mexico and the Senator from Connecticut and also the Senator from Indiana [Mr. Van Nuys], although he is not present, when I say that there is no jurisdiction whatever conferred by this bill providing for resort to the United States district court, except the one mentioned by the Senator from Connecticut, which is merely the right to go there for a civil action for damages, and

---

[15] See Conference Report on S. 796, H. Rep. No. 531, 78th Cong., 1st Sess.

no jurisdiction whatever is given over labor disputes. Does that answer the Senator?"

"Mr. Thomas of Utah. I thank the Senator for making that statement and I hope it will satisfy the lawyers of the country.

"Mr. Connally. I am sure it will." [16]

Under these circumstances the Bill became law, and the seizure giving rise to this controversy was made under that law. The separate items of this legislative history cannot be judged in isolation. They must be considered together, and as part of the course of legislation dealing with injunctions in labor disputes. To find that the Government has the right which Senator Connally's amendment sought to confer but which the Congress withheld is to say that voting down the amendment had the same effect as voting it up.

Events since the passage of the Act underscore what would appear to be the controlling legislative history of the War Labor Disputes Act, and prove that Congress saw fit not to authorize district courts to issue an injunction in cases like this. To meet the grave crisis growing out of the strike on the railroads last May, Congress, upon the recommendation of the President and the Attorney General, deemed additional legislation necessary for dealing with labor disputes. The proposals in each house carried a provision which authorized an injunction to issue for violation of the War Labor Disputes Act.[17] Senator Mead proposed an amendment to delete the provisions for injunctions.[18] In the debates that followed no one suggested that the new proposal was unnecessary, that the

---

[16] 89 Cong. Rec. 5754. The Senators mentioned by Mr. Connally were the managers on the part of the Senate of the bill in conference.

[17] H. R. 6578, 79th Cong., 2d Sess.

[18] 92 Cong. Rec. 6019.

jurisdiction proposed to be conferred already existed, or that if granted, as requested by the Attorney General, it would not, as Senator Mead claimed, repeal *pro tanto* the Norris-LaGuardia Act. The debates show clearly that what was contemplated was a change in the War Labor Disputes Act, whereby a new and an additional remedy would be authorized.[19]   The Bill never became law.

As is well known, as the debates clearly show, as Senator Connally admitted, the War Labor Disputes Act was directed primarily against stoppage in the coal mines.[20]   The situation that Congress feared was exactly that which has occurred and which underlies this controversy.   To deal with the situation, Congress gave the United States the power to seize the mines.   To effectuate this power, the Government was given authority to invoke criminal penalties for interferences with the operation of the mines. Senator Connally sought more.   He wanted Congress to empower the district courts to enjoin interference.   The Senate did not want an injunction to issue and voted the proposal down.   The Senate's position was adopted by

---

[19] See, particularly, the statements of Senator Mead (pp. 6019–20), Senator Morse (pp. 6021, 6022), Senator Pepper (pp. 6022, 6023), Senator Wagner (p. 6022), Senator Wheeler (p. 6025), Senator Barkley (p. 6028), Senator Fulbright (p. 6024).

[20] Senator Connally said: "Mr. Lewis appeared before the Truman committee 3 or 4 weeks ago.   I happen to be a member of that committee, and when he said he did not regard his no-strike agreement as binding . . . I determined then that if I could get this bill before the Senate, I was going to bring it up and press it in order that if he did disregard the agreement, the President or the Government of the United States would have a weapon with which to meet the threat and the danger." 89 Cong. Rec. 3886.   See also H. Rep. No. 440, 78th Cong., 1st Sess., p. 6.   The references to the coal situation in the debates are innumerable.   See, *e. g.*, 89 Cong. Rec. 3767, 3886, 3888, 3889, 3900–01.

the Conference Committee. The House of Representatives yielded its view and approved the Conference report. The whole course of legislation indicates that Congress withheld the remedy of injunction. This Court now holds that Congress authorized the injunction.

I concur in the Court's opinion insofar as it is not inconsistent with these views, and, under the compulsion of the ruling of the majority that the court below had jurisdiction to issue its orders, I join in the Court's judgment.

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS, concurring in part and dissenting in part.

For the reasons given in the Court's opinion, we agree that neither the Norris-LaGuardia Act nor the War Labor Disputes Act barred the Government from obtaining the injunction it sought in these proceedings. The "labor disputes" with which Congress was concerned in the Norris-LaGuardia Act were those between private employers and their employees. As to all such "labor disputes," the Act drastically limited the jurisdiction of federal courts; it barred relief by injunction except under very narrow circumstances, whether injunction be sought by private employers, the Government, or anyone else. But the attention of Congress was neither focused upon, nor did it purport to affect, "labor disputes," if such they can be called, between the Government and its own employees. There was never an intimation in the progress of the Act's passage that a labor dispute within the Act's meaning would arise because of claims against the Government asserted collectively by employees of the Interior, State, Justice, or any other Government department. Congress had never in its history provided a program for fixing wages, hours, and working conditions of its employees by collective bargaining. Working condi-

tions of Government employees had not been the subject
of collective bargaining, nor been settled as a result of
labor disputes. It would require specific congressional
language to persuade us that Congress intended to em-
bark upon such a novel program or to treat the Govern-
ment employer-employee relationship as giving rise to a
"labor dispute" in the industrial sense.

We have no doubt that the miners became Govern-
ment employees when the Government took over the
mines. It assumed complete control over the mines and
their operation. The fact that it utilized the managerial
forces of the private owners does not detract from the Gov-
ernment's complete authority. For whatever control
Government agents delegated to the private managers,
those agents had full power to take away and exercise
themselves. If we thought, as is here contended, that the
Government's possession and operation of the mines were
not genuine, but merely pretended, we should then say
that the Norris-LaGuardia Act barred these proceedings.
For anything less than full and complete Government
operation for its own account [1] would make this proceed-
ing the equivalent of the Government's seeking an injunc-
tion for the benefit of the private employers. We think
the Norris-LaGuardia Act prohibits that. But as we read
the War Labor Disputes Act and the President's order
taking over the mines against the background of cir-
cumstances which prompted both, we think, apparently
contrary to the implications of the regulations, that the
Government operates these mines for its own account as
a matter of law; [2] and those who work in them, during

[1] An analogy is a taking by the Government of a leasehold interest
in property in whole or in part. See *United States* v. *Petty Motor
Co.*, 327 U. S. 372.

[2] Section 9 of the Selective Service Act, 54 Stat. 892, 50 U. S. C.
App. § 309, granted power "to take immediate possession of any . . .
plant . . . and through the appropriate branch, bureau, or depart-

the period of complete Government control, are employees of the Government.

Since the Norris-LaGuardia Act is inapplicable, we agree that the District Court had power in these proceedings to enter orders necessary to protect the Government against an invasion of the rights it asserted, pending adjudication of the controversy its complaint presented to the court. It is therefore unnecessary for us to reach the question of whether the District Court also had power to enter these orders under the doctrine of *United States* v. *Shipp,* 203 U. S. 563.

We agree that the court had power summarily to coerce obedience to those orders and to subject defendants to such conditional sanctions as were necessary to compel obedience. And we agree that in such civil contempt proceedings to compel obedience, it was not necessary for the court to abide by all the procedural safeguards which surround trials for crime. Without such coercive powers, courts could not settle the cases and controversies before them. Courts could not administer justice if persons were left free pending adjudication to engage in conduct which would either immediately interrupt the judicial proceedings or so change the *status quo* of the subject matter of a controversy that no effective

ment of the Army or Navy to manufacture therein such product . . . as may be required . . . ." And it provides for payment: "The compensation to be paid . . . as rental for use of any manufacturing plant while used by the United States, shall be fair and just . . . ." Section 3 of the War Labor Disputes Act, 57 Stat. 164, 50 U. S. C. App. Supp. V § 309, extended this authority to include power to take immediate possession of any "mine . . . equipped for the manufacture, production, or mining of any articles or materials which may be required for the war effort . . . whenever the President finds . . . and proclaims that there is an interruption of the operation of such . . . mine . . . as a result of a strike or other labor disturbance . . . and that the exercise of such power and authority is necessary to insure the operation of such . . . mine . . . in the interest of the war effort . . . ."

judgment could be rendered. Disorder in the courtroom, or so near to it as to interrupt a trial, and disobedience of an affirmative court order, are typical examples of offenses which must necessarily be dealt with summarily. To remove such imminent interference with orderly judicial proceedings, courts must have power to act immediately. In recognition of this fact, the contempt power came into existence.[3] This power is of ancient lineage,[4] has always been exercised by our courts, and has the express recognition of Congress under the name of contempt. Rev. Stat. § 725, 28 U. S. C. § 385. Where the court exercises such coercive power, however, for the purpose of compelling future obedience, those imprisoned "carry the keys of their prison in their own pockets," *In re Nevitt*, 117 F. 448, 461; by obedience to the court's valid order, they

---

[3] See *e. g., Cooke* v. *United States*, 267 U. S. 517, 534–537; Fox, History of Contempt of Court (1927); Beale, *Contempt of Court*, 21 Harv. L. Rev. (1908) 161, 169–170.

[4] "As early as the time of Richard III it was said that the chancellor of England compels a party against whom an order is issued by imprisonment; [2 R. III, 9 pl. 22] and a little later it was said in the chancery that 'a decree does not bind the right, but only binds the person to obedience, so that if the party will not obey, then the chancellor may commit him to prison till he obey, and that it is all the chancellor can do.' [27 H. VIII, 15.] This imprisonment was by no means a punishment, but was merely to secure obedience to the writ of the king. Down to within a century it was very doubtful if the chancellor could under any circumstances inflict punishment for disobedience of a decree. If the decree commanded the defendant to transfer property, the chancellor acquired power as early as the sixteenth century to sequester the property as security for performance; but if the decree were for the doing of any other act, or were a decree for an injunction, the chancellor was helpless if he could not compel obedience by imprisonment. . . . In any case the contempt of a defendant who had violated a decree in chancery could be purged by doing the act commanded and paying costs; or, if his disobedience had been the violation of a negative injunction, he could purge himself of contempt by undoing what he had done and paying costs." Beale, *supra*.

can end their confinement; and the court's coercive power in such a "civil contempt" proceeding ends when its order has been obeyed. *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 441, 445. See also *Doyle* v. *London Guarantee Co.*, 204 U. S. 599, 607. The District Court did not enter a conditional decree here. But this Court has modified the District Court's decree to provide as part of the judgment such a coercive sanction in the form of a conditional fine. We agree with the Court's decision in this respect.[5]

The *Gompers* decision and many others have pointed out that the object of such coercive contempt proceedings is not to punish for an offense against the public, but to compel obedience to valid court orders. Yet the decision of this Court also approves unconditional fines as criminal punishment for past disobedience. We cannot agree to this aspect of the Court's judgment. At a very early date this Court declared, and recently it has reiterated, that in contempt proceedings courts should never exercise more than "the least possible power adequate to the end proposed." *Anderson* v. *Dunn*, 6 Wheat. 204, 231; *In re Michael*, 326 U. S. 224, 227.

---

[5] "In the case of contempt in violating an order or decree of a court of equity, we have an entirely different problem. . . . If the court limits itself to its proper action in such cases, namely, process of imprisonment merely to prevent the violation of the decree, and if the imprisonment is to cease as soon as the danger of disobedience has ceased, the jury, which is thought necessary to pass upon the desert of a defendant to suffer punishment, is not required. . . . So far, therefore, as popular clamor demands a trial by jury in such a case, it seems to go beyond the requirements of justice; and the statutes which commit the trial of questions of fact in such process to a jury are not likely permanently to prove satisfactory. This statement, however, is to be limited to cases of merely preventive imprisonment. Where the court inflicts a definite term of imprisonment by way of punishment for the violation of its orders, the case does not differ, it would seem, from the case of criminal contempt out of court, and regular process and trial by jury should be required." *Id.* 173–174.

In certain circumstances criminal contempt culminating in unconditional punishment for past disobedience may well constitute an exercise of "the least possible power adequate to the end proposed." Thus in situations which would warrant only a use of coercive sanctions in the first instance, criminal punishment might be appropriate at a later stage if the defendant should persist in disobeying the order of the court. Without considering the constitutional requisites of such criminal punishment, we believe the application of it inappropriate and improper here. The imposition of criminal punishment here was an exercise of far more than "the least possible power adequate to the end proposed." For here the great and legitimate "end proposed" was affirmative action by the defendants to prevent interruption of coal production pending final adjudication of the controversy. Coercive sanctions sufficient to accomplish this end were justified. From the record we have no doubt but that a conditional civil sanction would bring about at least as prompt and unequivocal obedience to the court's order as would criminal punishment for past disobedience. And this would accomplish a vindication of the District Court's authority against a continuing defiance. Consequently, we do not believe that the accomplishment of the justifiable "end proposed" called for summary criminal punishment which is designed to deter others from disobedience to court orders or to avenge a public wrong, rather than the imposition of a coercive sanction. And for the reasons stated by MR. JUSTICE RUTLEDGE, we think that the flat $700,000 criminal fine against the defendant union is excessive by constitutional and statutory standards.

In determining whether criminal punishment or coercive sanction should be employed in these proceedings, the question of intent—the motivation of the contumacy—becomes relevant. Difficult questions of law were presented by this case. It is plain that the defendants acted

willfully for they knew that they were disobeying the court's order. But they appear to have believed in good faith, though erroneously, that they were acting within their legal rights. Many lawyers would have so advised them. This does not excuse their conduct; the whole situation emphasized the duty of testing the restraining order by orderly appeal instead of disobedience and open defiance. However, as this Court said in *Cooke* v. *United States,* 267 U. S. 517, 538, "the intention with which acts of contempt have been committed must necessarily and properly have an important bearing on the degree of guilt and the penalty which should be imposed."

We think it significant that the conduct which was prohibited by the restraining order for violation of which these defendants have been punished for contempt is also punishable under the War Labor Disputes Act. That Act provides a maximum punishment of $5,000 fine and one year imprisonment for those who interfere with the operation of mines taken over by the United States. Had the defendants been tried under that statute, their punishment would have been limited thereby and in their trial they would have enjoyed all the constitutional safeguards of the Bill of Rights. Whatever constitutional safeguards are required in a summary contempt proceeding, whether it be for criminal punishment, or for the imposition of coercive sanction, we must be ever mindful of the danger of permitting punishment by contempt to be imposed for conduct which is identical with an offense defined and made punishable by statute. *In re Michael, supra.*[6]

[6] See also *In re Debs,* 158 U. S. 564; *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418; *Gompers* v. *United States,* 233 U. S. 604, 610, 611; *Ex parte Grossman,* 267 U. S. 87; *Ex parte Hudgings,* 249 U. S. 378, 383; *Michaelson* v. *United States,* 266 U. S. 42; *Blackmer* v. *United States,* 284 U. S. 421, 440; *Nye* v. *United States,* 313 U. S. 33; *Bridges* v. *California,* 314 U. S. 252, 264; *Pendergast* v. *United States,* 317 U. S. 412; *In re Bradley,* 318 U. S. 50. Frankfurter and Landis, *Power of Congress Over Procedure in Criminal Contempts in "In-*

The situation of grave emergency facing the country when the District Court acted called for the strongest measures—measures designed to produce quick and unqualified obedience of the court's order. If the $10,000 fine on defendant Lewis and the $3,500,000 fine on the defendant union be treated as coercive fines, they would not necessarily be excessive. For they would then be payable only if the defendants continued to disobey the court's order. Defendants could then avoid payment by purging themselves. The price of continued disobedience would be the amount of the fines. See *Doyle* v. *London Guarantee Co., supra,* 602. The fines would be fixed so as to produce the greatest likelihood that they would compel obedience.

We should modify the District Court's decrees by making the entire amount of the fines payable conditionally. On December 7, 1946, Mr. Lewis directed the mine workers to return to work until midnight, March 31, 1947. But, so far as we are aware, the notice which purported to terminate the contract has not been withdrawn. Thus, there has been, at most, only a partial compliance with the temporary injunction.

Hence our judgment should provide that the defendants pay their respective fines only in the event that full and unconditional obedience to the temporary injunction, including withdrawal of the notice which purported to terminate the contract, is not had on or before a day certain.

Mr. Justice Murphy, dissenting.

An objective reading of the Norris-LaGuardia Act removes any doubts as to its meaning and as to its applicability to the facts of this case. Section 4 provides in

---

*ferior" Federal Courts,* 37 Harv. L. Rev. 1010, 1043–1045 (1924) and authorities there collected; Nelles and King, *Contempt by Publication in the United States,* 28 Col. L. Rev. 401 (1928).

clear, unmistakable language that "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute . . . ." That language, which is repeated in other sections of the Act, is sufficient by itself to dispose of this case without further ado. But when proper recognition is given to the background and purpose of the Act, it becomes apparent that the implications of today's decision cast a dark cloud over the future of labor relations in the United States.

Due recognition must be given to the circumstances that gave rise to this case. The Government was confronted with the necessity of preserving the economic health of the nation; dire distress would have eventuated here and abroad from a prolonged strike in the bituminous coal mines. It was imperative that some effective action be taken to break the stalemate. But those factors do not permit the conversion of the judicial process into a weapon for misapplying statutes according to the grave exigencies of the moment. That can have tragic consequences even more serious and lasting than a temporary dislocation of the nation's economy resulting from a strike of the miners.

The whole thrust of the Norris-LaGuardia Act is directed toward the use of restraining orders and injunctions in cases arising out of labor disputes between private employers and private employees. It was in that setting that the abuses of federal equity power had flourished; and it was those abuses that led to the adoption of the Act. The application of the Act to the instant situation is thus clear. It cannot be denied that this case is one growing out of a labor dispute between the private coal operators and the private miners. That is a matter of common knowledge. Executive Order No. 9728, which authorized the Secretary of the Interior to take possession of and to operate the coal mines, explicitly stated that this action

was taken "as a result of existing or threatened strikes and other labor disturbances." Those strikes and labor disturbances grew out of the relations between the operators and the miners. The Government further recognized that fact by its subsequent refusal to negotiate with the miners on their demands and its insistence that these demands be addressed to the private mine owners. It is precisely in situations arising out of disputes of this nature that Congress has said that no court of the United States shall have jurisdiction to issue any restraining order or injunction.

The crux of this case is whether the fact that the Government took over the possession and operation of the mines changed the private character of the underlying labor dispute between the operators and the miners so as to make inapplicable the Norris-LaGuardia Act. The answer is clear. Much has been said about the Government's status as employer and the miners' status as Government employees following the seizure. In my opinion, the miners remained private employees despite the temporary gloss of Government possession and operation of the mines; they bear no resemblance whatever to employees of the executive departments, the independent agencies and the other branches of the Government. But when all is said and done, the obvious fact remains that this case involves and grows out of a labor dispute between the operators and the miners. Government seizure of the mines cannot hide or change that fact. Indeed, the seizure took place only because of the existence of the dispute and because it was thought some solution might thereafter result. The dispute, however, survived the seizure and is still very much alive. And it still retains its private character, the operators on the one side and the coal miners on the other.

The important point, and it cannot be overemphasized, is that Congress has decreed that strikes and labor disturb-

ances growing out of private labor disputes are to be dealt with by some means other than federal court restraining orders and injunctions. Further confirmation, if any be needed, is to be found in the terms and in the history of the War Labor Disputes Act. To this clearly enunciated policy of making "government by injunction" illegal, Congress has made no exception where the public interest is at stake or where the Government has seized the private properties involved. Congress can so provide. But it has not done so as yet; until it does, we are not free to sanction the use of restraining orders and injunctions in a case of this nature.

The Government's seizure of the coal mines thus becomes irrelevant to the issue. The federal equity power to issue restraining orders and injunctions simply cannot be invoked in this case, since it grows out of a private labor dispute. And it makes no difference that the party seeking the proscribed relief is the Government rather than a private employer. The touchstone of the Norris-La-Guardia Act is the existence of a labor dispute, not the status of the parties. Among the specific evils which the framers of the Act had in mind were the injunctions secured by the Government in the *Debs,* the *Hayes* and the *Railway Shopmen's* cases. The Act was drawn to prevent, among other things, the recurrence of such injunctions. The Government concededly could not obtain an injunction in a private labor dispute where there has been no seizure of private properties, no matter how great the public interest in the dispute might be. To permit the Government to obtain an injunction where there has been a seizure would equally flout the language and policy of the Act. In whatever capacity the Government acts, this statute closes the doors of the federal courts where a restraining order or injunction is sought in a case arising out of a private labor dispute.

Moreover, if seizure alone justifies an injunction contrary to the expressed will of Congress, some future Government could easily utilize seizure as a subterfuge for breaking any or all strikes in private industries. Under some war-time or emergency power, it could seize private properties at the behest of the employers whenever a strike threatened or occurred on a finding that the public interest was in peril. A restraining order could then be secured on the specious theory that the Government was acting in relation to its own employees. The workers would be effectively subdued under the impact of the restraining order and contempt proceedings. After the strike was broken, the properties would be handed back to the private employers. That essentially is what has happened in this case. That is what makes the decision today so full of dangerous implications for the future. Moreover, if the Government is to use its seizure power to repudiate the Norris-LaGuardia Act and to intervene by injunction in private labor disputes, that policy should be determined by Congress. It is not the function of this Court to sanction that policy where Congress has remained silent. Once Congress has spoken, it will be time enough to consider the constitutional issues raised by an application of that policy.

Since in my view the restraining order and the temporary injunction in this case are void and without effect, there remains for me only the contention that the defendants are guilty of criminal contempt for having willfully ignored the void restraining order. It is said that the District Court had the power to preserve existing conditions while it was determining its own authority to grant injunctive relief; hence the defendants acted at their own peril in disobeying the restraining order. Eloquent pleas are made for the supremacy of the judiciary over the individual and the requirement that a per-

son obey court orders until they are reversed by orderly and proper proceedings. Heavy emphasis is placed upon *United States* v. *Shipp,* 203 U. S. 563.

These arguments have a seductive attractiveness here. Ordinarily, of course, it is better policy to obey a void order than run the risk of a contempt citation. And as a general proposition, individuals cannot be allowed to be the judges of the validity of court orders issued against them. But the problem raised by the violation of the restraining order in this case must be viewed against the background and language of the Norris-LaGuardia Act.

Unlike most other situations, this Act specifically prohibits the issuance of restraining orders except in situations not here involved. There is no exception in favor of a restraining order where there is some serious doubt about the court's jurisdiction; indeed, the prohibition against restraining orders would be futile were such an exception recognized, for the minds of lawyers and judges are boundless in their abilities to raise serious jurisdictional objections. And so Congress has flatly forbidden the issuance of all restraining orders under this Act. It follows that when such an order is issued despite this clear prohibition, no man can be held in contempt thereof, however unwise his action may be as a matter of policy. When he violates the void order, 28 U. S. C. § 385 comes into operation, forbidding punishment for contempt except where there has been disobedience of a "lawful writ, process, order, rule, decree, or command" of a court.

This absolute outlawry of restraining orders in cases involving private labor disputes is not without reason. The issuance of such orders prior to the adoption of the Norris-LaGuardia Act had a long and tortured history. Time and again strikes were broken merely by the issuance of a temporary restraining order, purporting to maintain the *status quo.* Because of the highly fluid character of labor disputes, the delay involved in testing an order

of that nature often resulted in neutralizing the rights of employees to strike and picket. And too often, these orders did more than stabilize existing conditions; they called for affirmative change. The restraining order in the instant case is but one example of this. While purporting to preserve the *status quo,* it actually commands the defendants to rescind the strike call—thereby affirmatively interfering with the labor dispute.

Congress was well aware of this use of restraining orders to break strikes. After full consideration, it intentionally and specifically prohibited their use, with certain exceptions not here relevant. We are not free to disregard that prohibition. Hence the doctrine of the *Shipp* case has no relation whatever to our present problem. That case dealt with an order of this Court staying the execution of a convicted felon, an order which lay within the recognized power of this Court and which had not been validly prohibited by Congress. Naturally, no man could violate that order with impunity. But we are acting here in the unique field of labor relations, dealing with a type of order which Congress has definitely proscribed. If we are to hold these defendants in contempt for having violated a void restraining order, we must close our eyes to the expressed will of Congress and to the whole history of equitable restraints in the field of labor disputes. We must disregard the fact that to compel one to obey a void restraining order in a case involving a labor dispute and to require that it be tested on appeal is to sanction the use of the restraining order to break strikes—which was precisely what Congress wanted to avoid. Every reason supporting the salutary principle of the *Shipp* case breaks down when that principle is applied in this setting. I would therefore reverse the judgment of the District Court *in toto.*

It has been said that the actions of the defendants threatened orderly constitutional government and the

economic and social stability of the nation. Whatever may be the validity of those statements, we lack any power to ignore the plain mandates of Congress and to impose vindictive fines upon the defendants. They are entitled to be judged by this Court according to the sober principles of law. A judicial disregard of what Congress has decreed may seem justified for the moment in view of the crisis which gave birth to this case. But such a disregard may ultimately have more disastrous and lasting effects upon the economy of the nation than any action of an aggressive labor leader in disobeying a void court order. The cause of orderly constitutional government is ill-served by misapplying the law as it is written, inadequate though it may be, to meet an emergency situation, especially where that misapplication permits punitive sanctions to be placed upon an individual or an organization.

Mr. Justice Rutledge, dissenting.

This case became a *cause célèbre* the moment it began. No good purpose can be served by ignoring that obvious fact. But it cannot affect our judgment save only perhaps to steel us, if that were necessary, to the essential and accustomed behavior of judges.[1] In all cases great or small this must be to render judgment evenly and dispassionately according to law, as each is given understanding to ascertain and apply it.

---

[1] "Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." Holmes, J., dissenting, in *Northern Securities Co.* v. *United States,* 193 U. S. 197, 400–401.

No man or group is above the law. Nor is any beyond its protection. *In re Yamashita,* 327 U. S. 1, dissenting opinion, 41. These truths apply equally to the Government. When its power is exerted against the citizen or another in the nation's courts, those tribunals stand not as partisans, but as independent and impartial arbiters to see that the balance between power and right is held even. In discharging that high function the courts themselves, like the parties, are subject to the law's majestic limitations. We are not free to decide this case, or any, otherwise than as in conscience we are enabled to see what the law commands.

## I.

MR. JUSTICE FRANKFURTER has shown conclusively, I think, that the policy of the Norris-LaGuardia Act, 47 Stat. 70, applies to this situation. The legislative history he marshals so accurately and cogently compels the conclusion that the War Labor Disputes Act of 1943, 57 Stat. 163, not only confirms the applicability of the earlier statute, but itself excludes resort to injunctive relief for enforcement of its own provisions in situations of this sort.

That Act expressly provides the remedies for its enforcement. Beyond seizure of plants, mines and facilities for temporary [2] governmental operation, they are exclusively

---

[2] *"Provided,* That whenever any such plant, mine, or facility has been or is hereafter so taken by reason of a strike, lock-out, threatened strike, threatened lock-out, work stoppage, or other cause, such plant, mine, or facility *shall be returned to the owners thereof as soon as practicable, but in no event more than sixty days after the restoration of the productive efficiency thereof prevailing prior to the taking of possession thereof . . . ."* (Emphasis added.) War Labor Disputes Act § 3 (Act of June 25, 1943, 57 Stat. 163, 50 U. S. C. App. §§ 1501, 1503).

criminal in character.[3]   They do not include injunctive or
other equitable relief.   Nor was the omission uninten-
tional or due to oversight.   It was specific and deliberate.

The Senate thoroughly considered and debated various
proposals for authorizing equity to intervene in labor dis-
putes, one by the Act's sponsor in that body.   Positively,
repeatedly and unwaveringly it rejected all of them.   They
were likewise rejected in conference, where the Senate's
view prevailed over that of the House.   The latter body
had not been inattentive to the problem.   It sought and
failed to secure the very thing this Court now says, in
effect, was included.[4]   That issue and that policy were
indeed the main thrust and focus of the legislative struggle,
and the outcome was not negative; it was positive and
conclusive against using or giving the equitable remedies.

---

[3] "Sec. 6. (a) Whenever any plant, mine, or facility is in the pos-
session of the United States, it shall be unlawful for any person (1) to
coerce, instigate, induce, conspire with, or encourage any person, to
interfere, by lock-out, strike, slow-down, or other interruption, with
the operation of such plant, mine, or facility, or (2) to aid any such
lock-out, strike, slow-down, or other interruption interfering with the
operation of such plant, mine, or facility by giving direction or guid-
ance in the conduct of such interruption, or by providing funds for
the conduct or direction thereof or for the payment of strike, unem-
ployment, or other benefits to those participating therein.   No in-
dividual shall be deemed to have violated the provisions of this section
by reason only of his having ceased work or having refused to continue
to work or to accept employment.

"(b) Any person who willfully violates any provision of this section
shall be subject to a fine of not more than $5,000, or to imprisonment
for not more than one year, or both."   War Labor Disputes Act of
1943, § 6.

[4] The issue is not avoided, nor is the effect of final legislative rejec-
tion nullified, by the easy device of resting the power said to exist upon
common law rules of statutory construction which, if otherwise per-
tinent, were in the very teeth of Congress' positive refusal to confer
the power after the fullest and most attentive consideration.   That
device only conceals the true issue.   See also note 11.

Surely we have not come so far toward complete inversion of legislative history as to write out of the law the views concerning a matter of such major policy held by the chamber which prevailed at the final stage of enactment and to write into the law diametrically opposing views of another chamber which yielded at that time. The case, as MR. JUSTICE FRANKFURTER demonstrates beyond any doubt, cannot be one where inattention, oversight or inaction may explain or give significance to what was done by the House of Representatives. That body was defeated, not simply silent, in the outcome. Willingly or otherwise, it acquiesced in the Senate's policy of refusing to authorize injunctive relief, and in doing so joined formally and effectively in the final act which made that policy law.

This means to me that Congress, in that action, did not simply confirm the Norris-LaGuardia Act's policy or leave it untouched with respect to situations within the War Labor Disputes Act's coverage. It means that Congress was not departing from or nullifying that policy. Rather by the later Act Congress adopted the same policy, the long prevailing national policy, for those situations.

The Senate, and at the end the Congress, were not declining expressly to authorize labor injunctions only to turn squarely about and nullify that refusal in the same breath, merely by virtue of the fact that the employees of seized plants necessarily were made subject temporarily to ultimate governmental operating direction and control.[5] We cannot attribute to Congress an intent so du-

[5] Seizure without such ultimate control, of course, would have been only one-sided, halfway seizure, operative only against management and owners. But seizure with such control did not require or mean that the control was to be exercised by labor injunctions. There was, and is, no inconsistency whatever between conferring the one power and denying the other. For this is exactly what Congress has done with reference to all plants not subject to the seizure power. Besides

plicitous. Thus to construe the Act not only would bring the provision for temporary control into collision with its remedial provisions as the history shows they were intended to apply. It would be to find Congress guilty of using a devious method for achieving indirectly exactly the thing it expressly declined to do. The words "governmental employee," "employee . . . for the purposes of this case" or "relationship . . . of employer and employee," none of which appear in the statute, cannot be given effect consistently with our function to write into the Act, by judicial interpolation, remedial provisions which Congress flatly and finally declined to incorporate.

Whether Congress acted wisely in this refusal is not our concern. But it is not irrelevant to the Act's meaning, purpose and effect that there were good reasons, indeed strong ones, for Congress to continue to follow the Norris-LaGuardia Act's policy rather than break away from it at that crucial time. Under the statute practically every industrial or mining facility, together with many of transportation,[6] was subject to seizure and governmental operation. Introducing the labor injunction into the Act's structure therefore would have been tantamount to repeal of the Norris-LaGuardia Act for the duration of the emergency powers, since seizure was authorized whenever the President should find, after investigation, and proclaim that there was an interruption of operations "as a result

imputing to Congress the purpose to do with one hand what the other denied was being done, the identification of these two very distinct things serves only to confuse and make obscure the real question. This is simply whether Congress intended to abrogate for seized plants or to continue in force the established policy against labor injunctions as a method of exercising the powers of ultimate control conferred upon the Government.

[6] Section 2 (c) excludes carriers as defined in Title I of the Railway Labor Act, 45 U. S. C. § 151, or carriers by air as subject to Title II of the Railway Labor Act, 45 U. S. C. § 181.

of a strike or other labor disturbance." § 3. Ready means thus would have been made available, if such had been the statute's purpose, for suspending the Norris-La-Guardia policy and provisions in any case where they might become operative.

Congress was thoroughly familiar with the history and effects of injunctions in labor disputes, with the long settled national policy against them, and with the universal abhorrence in the ranks of labor, however otherwise divided, toward them. In view of all these things Congress well may have felt and I think did feel, as my brother's recital of the history shows, that it was both unnecessary and unwise, perhaps would even be harmful to furtherance of the war effort, in substance to repeal the Norris-LaGuardia policy for the duration of the war emergency and thus to resurrect, in that critical situation, the long disused instruments that Act had outlawed.

It is important in this connection that 1943, rather than 1945 or 1946, was the year in which the War Labor Disputes Act was adopted. We were then not yet over the hump of the war. But neither had we reached the peak of labor disturbances which came only after active hostilities ceased, more than two years later.[7] The great body of American workers was bending to the patriotic duty of peak production for war purposes. By comparison with what occurred after the fighting ended, the volume of man-

---

[7] The available statistics speak in terms of "strikes" for 1943 and "work stoppages arising from labor-management disputes" for 1945 and 1946. For 1943, 13,500,529 man-days were lost through strikes. For 1945, 38,025,000 man-days were lost through work stoppages, and 113,000,000 man-days were so lost in 1946. In 1943 there were 3,752 strikes. In 1945 there were 4,750 work stoppages and in 1946, 4,700. See Strikes in 1943, Bull. No. 782, U. S. Bureau of Labor Statistics; Work Stoppages Caused by Labor-Management Disputes in 1945, Bull. No. 878, U. S. Bureau of Labor Statistics; Review of Labor-Management Disputes, 1946, U. S. Bureau of Labor Statistics Release, January 11, 1947.

days lost was about one-tenth of the later postwar peak loss.[8]  Moreover, at that time the War Labor Board, specially constituted to deal with such disturbances, was functioning with a high degree of efficiency in their settlement.[9] There was nevertheless strong feeling that labor disputes should not be allowed to interrupt war production, regardless of cause or blame.  And from this arose the demand for more effective powers to deal with them.

It was in this setting and to meet the problems it had thrown up, not the later one out of which this controversy arose, that the War Labor Disputes Act was adopted. The Act was exactly what its title indicated, a measure for dealing with labor disputes in the emergency of the war.  Congress, it is true, anticipated that for a limited period after the end of fighting the same emergency powers would be needed.[10]  But this does not mean that those

---

[8] See note 7.

[9] See Hearings before the Committee on Military Affairs of the House of Representatives on S. 796, 78th Cong., 1st Sess., 25–26. "The War Labor Board was set up to deal with industrial relations. While this Board may not have a perfect record, it has a very good record to its credit, particularly when we consider the great problems it must deal with." 89 Cong. Rec. 5339.

The number of War Labor Board cases resulting in plant seizures by the United States, so far as statistics are available, is as follows: Four cases from June 25, 1943, the date of the passage of the War Labor Disputes Act, to December 31, 1943; seventeen cases from January 1, 1944, to December 31, 1944; fifteen cases from January 1, 1945, to August, 1945.  We are informed that in no instance of seizure, except the one under consideration, was a labor injunction issued at the behest of the Government.

[10] Section 3 provides: *"Provided further,* That possession of any plant, mine, or facility shall not be taken under authority of this section after the termination of hostilities in the present war, as proclaimed by the President, or after the termination of the War Labor Disputes Act; and the authority to operate any such plant, mine, or facility under the provisions of this section shall terminate at the end

powers were shaped, or are now to be measured in scope, so as to meet all of the situations which since have arisen in the vastly changed circumstances; or that Congress intended them to be met by repealing the settled policy against injunctions in labor disputes in the sweeping manner now accomplished by the Court's decision. On the contrary, in June of 1943, Congress dealt with the situation then before it and refused to authorize such relief because that situation did not demand this.

In view of all these considerations, I cannot believe that Congress, in effect and by indirection, was exerting its war power to the greatest possible extent or was thereby either repealing or suspending the nation's settled policy against injunctions in labor disputes. Rather, the conclusion is inescapable that Congress was relying exclusively upon the added powers of enforcement expressly conferred by the Act, namely, the power of seizure and the force of the criminal sanction, to accomplish the needed results.[11]

These were in themselves powerful sanctions. They carried with them the added and very great sanction of

---

of six months after the termination of such hostilities as so proclaimed."

It may be noted that on December 31, 1946, the President by proclamation announced the end of hostilities. 12 Fed. Reg. 1. The emergency powers conferred by the Act terminate six months thereafter.

[11] If general common law rules of statutory construction were appropriate for criteria to determine such issues as this case presents for the meaning of the Act, certainly that rule would be equally applicable with any other which dictates that when a statute provides specific remedies adequate for enforcing its provisions those remedies alone are deemed to be made available. But in view of the legislative and other history, this case is not one to be turned, in my opinion, by such vague, conveniently selective and often, as here, contradictory canons of construction.

aroused public opinion [12] which would follow not simply upon interruption of essential war production but more particularly upon such an event in any facility taken over and operated under governmental auspices. Congress, after mature deliberation, concluded that these sanctions were adequate, and for that reason made them exclusive. In no other way can its repeated and final refusals to confer the strenuously sought equitable remedies be made consistent with the legislative and general history or be given meaning and effect. To construe the Act as permitting what Congress thus so explicitly refused to allow is to go beyond our function and intrude upon that of Congress. This we have no right or power to do. If the situation presented by the facts of this case is one which goes beyond the powers Congress has conferred for dealing with it, that is a matter for Congress' consideration, not for correction by this Court.

Accordingly, upon the specific terms of the War Labor Disputes Act itself, upon the legislative history as summarized by MR. JUSTICE FRANKFURTER, and upon the historical setting in which the statute was enacted as defining the problems it was designed to meet, together with shaping the nature and scope of the measures required to meet

---

[12] It is this sanction upon which Congress has chosen to rely ultimately, for instance, in the Railway Labor Act, though provision is made for preliminary resort to processes of conciliation, mediation and voluntary arbitration before the use of ultimate economic force by strike or lockout, when the sanction of public opinion comes chiefly into play. See *Brotherhood of Railroad Trainmen* v. *Toledo, Peoria & W. R. R.,* 321 U. S. 50; *General Committee* v. *Missouri-Kansas-Texas R. R.,* 320 U. S. 323. On the whole, that policy and the sanctions provided have worked successfully to eliminate stoppages in railway transportation. And as of June, 1943, it may be fairly assumed that Congress, in declining to authorize the issuance of labor injunctions, was conscious of and chose to rely upon this accepted sanction together with the specific ones then conferred by the War Labor Disputes Act.

them, I conclude that that Act in no way impaired but on the contrary adopted and incorporated the policy of the Norris-LaGuardia Act concerning the issuance of injunctions in labor disputes.

## II.

This conclusion substantially compels the further one that *United States* v. *Shipp,* 203 U. S. 563, has no valid application to the situation presented by this case.

This Court has not yet expressly denied, rather it has repeatedly confirmed Congress' power to control the jurisdiction of the inferior federal courts and its own appellate jurisdiction. Const., Art. III, § 2. *Ex parte McCardle,* 7 Wall. 506; *Lockerty* v. *Phillips,* 319 U. S. 182, 187, and authorities cited. See Warren, New Light on the History of the Federal Judiciary Act of 1789 (1923), 37 Harv. L. Rev. 49, 67 ff. That power includes the power to deny jurisdiction as well as to confer it. *Ibid.* And where Congress has acted expressly to exclude particular subject matter from the jurisdiction of any court, except this Court's original jurisdiction, I know of no decision here which holds the exclusion invalid, or that a refusal to obey orders or judgments contravening Congress' mandate is criminal or affords cause for punishment as for contempt.

If that were the law, the result could only be to nullify the congressional power over federal jurisdiction for a great volume of cases. And if it should become the law, for every case raising a question not frivolous concerning the court's jurisdiction to enter an order or judgment, that punishment for contempt may be imposed irrevocably simply upon a showing of violation, the consequences would be equally or more serious. The force of such a rule, making the party act on pain of certain punishment regardless of the validity of the order violated or the court's

jurisdiction to enter it as determined finally upon review, would be not only to compel submission.[13]    It would be also in practical effect for many cases to terminate the litigation, foreclosing the substantive rights involved without any possibility for their effective appellate review and determination.

This would be true, for instance, wherever the substantive rights asserted or the opportunity for exercising them would vanish with obedience to the challenged order.    Cf. *Ex parte Fisk,* 113 U. S. 713.    The First Amendment liberties especially would be vulnerable to nullification by such control.    Thus, the constitutional rights of free speech and free assembly could be brought to naught and censorship established widely over those areas merely by applying such a rule to every case presenting a substantial question concerning the exercise of those rights.    This Court has refused to countenance a view so destructive of the most fundamental liberties.    *Thomas* v. *Collins,* 323 U. S. 516. These and other constitutional rights would be nullified by the force of invalid orders issued in flat violation of the constitutional provisions securing them, and void for that reason.    The same thing would be true also in other cases involving doubt, where statutory or other rights asserted or the benefit of asserting them would vanish, for any practical purpose, with obedience.

Indeed it was because these were so often the effects, not simply of final orders entered after determination upon the merits, but of interlocutory injunctions and *ex parte* restraining orders, that the Norris-LaGuardia Act became law and, as I think, the War Labor Disputes Act continued in force its policy.    For in labor disputes the effect of such

---

[13] More especially when account is taken of the vast liberty, called "discretion," which courts are said to have, and in this case are held to have, in fixing punishments for contempts.    But see Part IV.

orders, it was pointed out officially and otherwise,[14] is generally not merely failure to maintain the *status quo* pending final decision on the merits. It is also most often to break the strike, without regard to its legality or any conclusive determination on that account, and thus to render moot and abortive the substantive controversy.[15]

[14] "The restraining order and the preliminary injunction invoked in labor disputes reveal the most crucial points of legal maladjustment. Temporary injunctive relief without notice, or, if upon notice, relying upon dubious affidavits, serves the important function of staying defendant's conduct regardless of the ultimate justification of such restraint. The preliminary proceedings, in other words, make the issue of final relief a practical nullity. . . . the suspension of strike activities, even temporarily, may defeat the strike for practical purposes and foredoom its resumption, even if the injunction is later lifted." Frankfurter and Greene, The Labor Injunction (1930) 200–201.

"Time is the essence of the strike. Keeping the injunction alive by dilatory tactics blunts the edge of the only effective instrument that labor possesses, namely, the strike.

"The bill now before us makes it well-nigh impossible to secure a restraining order except under the well-defined and limited conditions set out in sections 7 and 8." 75 Cong. Rec. 5489. See also *People ex rel. Sandnes* v. *Sheriff of Kings County*, 164 Misc. 355, 359.

[15] See note 14. *Ex parte Fisk*, 113 U. S. 713, presents another clear illustration of the type of right which would be wholly nullified by general application of the alleged broad conception of the *Shipp* doctrine. There the Circuit Court, in contravention of explicit acts of Congress as this Court found, had ordered Fisk to submit to oral examination before trial in a removed civil cause, the examination to be before a justice of the court and according to procedure prescribed by state law for the state court from which the case was removed. Fisk refused to obey the order, standing upon the Circuit Court's lack of jurisdiction to enter it, was held in contempt for this, and fined $500 and ordered imprisoned until the fine was paid. He brought habeas corpus to secure release from the imprisonment thus imposed.

This Court held void both the order for examination and the order of commitment, as beyond the Circuit Court's jurisdiction, and granted petitioner's release from custody. The Court said: "Not only is no such power [of examination] conferred, but it is prohibited

It is not every case therefore where substantial doubt appears, concerning either the issues in the main cause or the court's jurisdiction to issue interlocutory or other orders, in which violation will bring the so-called *Shipp* doctrine into play. If that were true, then indeed would a way have been found to nullify the constitutional limitations placed upon the powers of courts, including the control of Congress over their jurisdiction. Then also the liberties of our people would be placed largely at the mercy of invalid orders issued without power given by the Constitution and in contravention of power constitutionally withheld by Congress. *Ex parte Fisk,* 113 U. S. 713; *Thomas* v. *Collins, supra.*

Indeed the *Shipp* doctrine thus broadly conceived would go far toward nullifying the historic jurisdiction of this Court and others in habeas corpus, for it would do this in the many situations where the cause of commitment is violation of a doubtfully valid court order and the ground asserted for release is the court's lack of jurisdiction to enter it. Thus, in this case, if the party Lewis had been imprisoned rather than fined, the broad application now made of the *Shipp* decision would dictate that he could not be released by habeas corpus, even though it were now held here that the restraining orders were beyond the District Court's jurisdiction to issue.[16] If those

---

by the plain language and the equally plain purpose of the acts of Congress . . . The Circuit Court was, therefore, without authority to make the orders for the examination of petitioner in this case, and equally without authority to enforce these orders by process for contempt." Pp. 724, 726. Had Fisk submitted, as *Shipp* is now said to require should be done, not only would the specific commands of Congress have been nullified. His right, secured by those commands, could never have been vindicated. The statutes would have been made dead letters.

[16] Indeed at least one state court has held this result to follow and in his dissenting opinion in *In re Sawyer,* 124 U. S. 200, 224, Harlan, J.,

orders were valid, for purposes of finally and conclusively imposing punishment in contempt, regardless of the court's want of power to issue them, this would be so whether the punishment were fine or imprisonment. And it clearly would follow in cases of criminal contempt,[17] perhaps in others, that the court's lack of jurisdiction could furnish no basis for granting relief, unless the penalty were found to be cruel and unusual or, in the case of a fine, excessive.[18]

I cannot believe that the historic powers of our courts in habeas corpus or the rights of citizens, confirmed as these have been for so long by an unbroken line of decisions,[19] have been or can be overthrown and subverted,

---

stated this to be his view of the law (see however note 19), as apparently also it was of Waite, C. J. P. 223. See *Reid* v. *Independent Union,* 200 Minn. 599 (certiorari), but see the dissenting opinion, 200 Minn. at 612; Collateral Attack Upon Labor Injunctions Issued in Disregard of Anti-Injunction Statutes (1938) 47 Yale L. J. 1136; *People ex rel. Sandnes* v. *Sheriff of Kings County,* 164 Misc. 355.

[17] See Part IV.

[18] *Ibid.*

[19] *Ex parte Rowland,* 104 U. S. 604; *Ex parte Fisk,* 113 U. S. 713; *In re Ayers,* 123 U. S. 443, 507; *In re Sawyer,* 124 U. S. 200; *In re Burrus,* 136 U. S. 586; *Thomas* v. *Collins,* 323 U. S. 516 (arising under state law). And see *Ex parte Young,* 209 U. S. 123, 143; cf. pp. 135, 139, collecting the authorities.

In the *Sawyer* case, *supra,* the Court said: "The case cannot be distinguished in principle from that of a judgment of the Common Bench in England in a criminal prosecution, which was *coram non judice;* or the case of a sentence passed by the Circuit Court of the United States upon a charge of an infamous crime, without a presentment or indictment by a grand jury. *Case of the Marshalsea,* 10 Rep. 68, 76; *Ex parte Wilson,* 114 U. S. 417; *Ex parte Bain,* 121 U. S. 1." 124 U. S. at 221. Hardly can it be said that the *Sawyer* decision went on the ground that the question of jurisdiction to enter the order was not substantial, in view of the length and detail of the Court's opinion, which gave no hint of such a suggestion, and in view also of the fact that Field, J., concurred in a separate opinion and

merely by the fact that the question of the court's power
to issue the order violated may be doubtful and not
merely frivolous. Nor do I think the *Shipp* decision
accomplished or purported to accomplish so much.

Certainly if its purpose had been to overrule the de-
cisions so thoroughly established, and to trench so heavily
upon the historic liberties they and the Constitution itself
secure, some note would have been taken of that fact.
So great a revolution hardly could have been wrought
unanimously or without attentive recognition of what was
being done. There was indeed reference in the opinion
to the previous decisions. The Court stated: "It has
been held, it is true, that orders made by a court having
no jurisdiction to make them may be disregarded without
liability to process for contempt," citing the *Sawyer, Fisk,*
and *Rowland* cases.[20]  203 U. S. at 573. But there was not
the slightest suggestion, by this reference or otherwise,
that the Court had any purpose whatever to impair the
force of those decisions, much less to overrule them. Nor
in fact was this its intent. It mentioned them only to
put them aside as inapplicable to the situation before it.

Indeed, in *Gompers* v. *Bucks Stove & R. Co.,* 221 U. S.
418, decided five years after the *Shipp* decision, a unani-
mous Court joined in citing *Ex parte Rowland,* 104 U. S.
604, in context consistent only with the view that its doc-
trine, and therefore that of others like it decided prior to
the *Shipp* case, remained fully effective. P. 436. There
was no intimation, as otherwise necessarily would have
been given, that the *Shipp* decision had reversed or modi-
fied the *Rowland* case, or any like it, in any way. And in

---

Waite, C. J., and Harlan, J., wrote separate dissents taking the posi-
tion which the Court now accepts for this case. See note 16 *supra.*
Harlan, J., however, receded from his view in *Ex parte Young, supra,*
where he dissented on other grounds. 209 U. S. at 169, 174.

[20] See note 19.

*Ex parte Young,* 209 U. S. 123, not only the Court, p. 143, but the opposing distinguished counsel, pp. 135, 139, all concurred in reaffirming the *Rowland* ruling. Harlan, J., dissenting, retracted his former contrary view (see note 19 *supra*) in this respect. Pp. 169, 174. And Holmes, J., who spoke for the Court in the *Shipp* case, joined with the Court's reaffirmation of the *Rowland* doctrine in both the *Gompers* and *Young* opinions.

The Court in *Shipp* was dealing with a situation quite different from the ones presented in the previous decisions and in this case. In none of them was the action which violated the court's order such as would have defeated its jurisdiction not only to enter the order but also to proceed with the cause before it in any manner, except to deal with the matter of contempt.[21] In them the Court was not

---

[21] In *Ex parte Rowland,* 104 U. S. 604, the county commissioners' disobedience of an order commanding them to collect a certain tax did not moot the controversy, which was whether the judgment debtor, by proceeding against the proper county official, the tax collector, could satisfy its judgment by forcing collection of the tax; and, the order being held void, their action in disobeying it was held not to be contempt.

The disobedience of the petitioner in *Ex parte Fisk,* 113 U. S. 713, deprived the plaintiff in the suit against him of the use of his testimony but did not defeat this suit or the ability of the courts to decide whether he could be forced to submit to examination. See note 19 *supra.*

In *In re Sawyer,* 124 U. S. 200, the refusal of the city officials to obey an order enjoining them from removing a police judge did not vitiate judicial power to decide the issue whether the city officials possessed the removal power. The controversy remained and, as this Court pointed out, it was determinable by mandamus or *quo warranto.* This Court held the order invalid and the officials not guilty of contempt.

In *In re Burrus,* 136 U. S. 586, the refusal of the grandparents to give up the child upon order issued by a federal court did not destroy the power of the court, which had already been exercised,

faced with the necessity for taking action to vindicate its power to hear and determine the main controversy, as well as the incidental one arising upon the validity of the interlocutory or other order. Nor is it here.

But exactly such a situation was presented in the *Shipp* case. The conduct there held to be contempt not only was in itself criminal and in violation, as it turned out, of this Court's lawful order for taking the appeal in Johnson's case. It ousted this Court altogether of jurisdiction to take any action in that cause. It rendered the cause moot, thereby putting an end to any proceedings concerning it here or elsewhere. Shipp's alleged conduct constituted therefore the most serious possible interference with the due and orderly course of administering justice. It utterly destroyed the power of all courts to act. Further, the order violated was not made directly in contravention of an act of Congress, as was true in the *Fisk* case and, as I think, in this one. It rather was made in complete conformity with the statutes conferring authority on this Court to take jurisdiction of and hear such causes. Nothing in it violated either a congressional mandate and policy or the rights of any party.

Moreover the decision was not effective, as its doctrine is now said to be, to put Shipp to any choice of obedience on pain of certain punishment regardless of the violated order's validity or invalidity as ultimately determined on review. No such situation was presented on the facts, and no such ruling could properly have been made. Shipp had not been convicted. The case came here upon a challenge *in limine*, not after the event, made upon the plead-

though improperly the Court held, to determine whether the child was properly in their custody or in the custody of the father. As the contempt order was held void, habeas corpus was granted.

Moreover in none of these cases did the disobedience destroy the jurisdiction of the trial and appellate courts to determine jurisdiction.

ings in the contempt proceedings to their validity. The basis asserted was the invalidity of the order allowing the appeal in Johnson's case, for alleged want of jurisdiction of this Court to enter it.[22] That contention was rejected and the order was held valid. It was in this connection only that the Court stated it had "jurisdiction to determine its jurisdiction" in doubtful cases. That statement was not a ruling that, regardless of a violated order's ultimate validity as determined on review,[23] punishment in contempt for violating it could be irrevocably imposed. It was merely a statement of the reason for the order's validity.[24] The holding was that this Court had jurisdiction,

---

[22] See note 24. The order allowing appeal directed "that all proceedings against the appellant be stayed, and the custody of the said appellant be retained, pending this appeal."

[23] See note 24. The Court was reviewing its own order, the one that was violated.

[24] The statement was made in response to counsel's contention that the order allowing the appeal was void and therefore would not support a conviction for contempt. The Court rejected the premise, not the conclusion.

The basis of counsel's contention was that the Circuit Court lacked jurisdiction and therefore that this Court also lacked jurisdiction. His brief stated: "The only question, therefore, is whether Johnson's proceeding in habeas corpus in the Circuit Court did or did not in fact constitute a 'case that involves the construction or application of the Constitution of the United States.' If it did, this Court had appellate jurisdiction of it and should proceed to inquire whether its order has been disobeyed. If it did not, this Court had no jurisdiction of it *and should now so hold for the purposes of this proceeding* . . . ." (Emphasis added.) And elsewhere the brief stated: "We assume that it will hardly be contended that the mere allowance of an appeal is sufficient to give the court jurisdiction of a case which from its nature is not appealable. Such action is *pro forma* only, and as it is necessarily had in every case the jurisdiction of the court would always be established by an *ex parte* order."

In answer to these arguments the Government's brief said: "Certainly no one would challenge the jurisdiction of this court if the Circuit Court had jurisdiction, and accordingly the defendants here

as of course it does in doubtful as well as clear cases, to determine whether the federal courts—the Circuit Court and accordingly this Court also—had power to pass upon Johnson's petition for habeas corpus.[25]

From that ruling and from it alone the consequence followed that Shipp could be held in contempt on proof, still to be made, that he had done acts in violation of the order as thus conclusively determined to be valid by the court of last resort. This was a far cry from holding that punishment in contempt can be laid irrevocably, regardless of the outcome on review concerning the order's validity. The Court by its ruling was not making void orders valid for purposes of punishment by way of contempt. Only if the Court has held its own order which Shipp violated invalid would such a question have been presented.

The *Shipp* decision therefore was in fact simply an application of the long established rule that punishment in contempt may be inflicted on proof of violation of a valid order of court as determined finally on review. It did not overrule, nor was it in any way inconsistent with the long prior course of decisions holding that when an order is void for want of jurisdiction it may be disobeyed with impunity pending but depending upon determination of its invalidity by appeal, habeas corpus, or other mode

deny the jurisdiction of this court simply as a corollary to their contention that the Circuit Court did not possess jurisdiction. But the jurisdiction of this court is not dependent upon contentions, and it has jurisdiction to take the case and retain it for final determination whether it turns out that the Circuit Court had jurisdiction or not."

[25] See note 24. No argument was made that even if the Circuit Court had jurisdiction this Court did not. Thus, the statement in the opinion "But even if the Circuit Court had no jurisdiction to entertain Johnson's petition, and if this court had no jurisdiction of the appeal, this court, and this court alone, could decide that such was the law," 203 U. S. at 573, means "But even if the Circuit Court had no jurisdiction to entertain Johnson's petition, and if *for that reason* this court had no jurisdiction of the appeal," etc.

of review. *Gompers* v. *Bucks Stove & R. Co., supra; Ex parte Young, supra.* It was an application, in the circumstances presented, of the settled rule that one who takes it upon himself to violate an order of court he thinks void thereby takes the risk that on review he will be sustained and, in the contrary event and then only, will he be subject irrevocably to punishment for contempt. *Ibid.*

In my judgment this is the rule properly applicable in this case, the only one consistent with the settled and unvaried course of decision, with the commands of the War Labor Disputes Act, of the Norris-LaGuardia Act, and with § 268 of the Judicial Code, 36 Stat. 1163, 28 U. S. C. § 385.

Apart from immediate and other interferences with judicial proceedings not presented here, that section authorizes punishment for contempt only for disobedience of a *"lawful* writ, process, order, rule, decree, or command of the said courts." (Emphasis added.) The section by its terms, apart from the exceptions not here applicable, limits power to punish for contempt to violations of lawful orders, thereby necessarily excluding others. Nor did it purport to make lawful for that purpose interlocutory orders issued without jurisdiction as determined finally upon review.[26]

This case, unlike the *Shipp* case, in no way involves interference with any of the legal proceedings or the due

---

[26] It has been held that habeas corpus will not lie where the disobedience was to a lawful, but erroneous, order of a court. *Ex parte Kearney,* 7 Wheat. 38. See also *Locke* v. *United States,* 75 F. 2d 157, 159: "Error must be corrected by appeal, and cannot be tested by disobedience. . . . Willful disobedience of an injunction, however erroneous, issued by a court having jurisdiction while such injunction is in force unreversed constitutes contempt of court." And it has been said that if an injunction is reversed on appeal on grounds other than "jurisdiction," the violator may nevertheless be punished for criminal, though not for civil, contempt. *Worden* v. *Searls,* 121 U. S. 14; *Salvage Process Corp.* v. *Acme Tank Cleaning Corp.,* 86 F. 2d 727.

course of administering justice in any sense contemplated by § 268 or by the *Shipp* decision. No court, trial cr appellate, was deprived by the defendants' conduct of jurisdiction or power to take any action in any of the proceedings, collateral or in the main suit, which existed at the beginning of the controversy. The order therefore falls exclusively within the concluding clause of § 268 and the power to punish for contempt on account of its violation depends, by the command of that clause, upon the order's lawful character.

Since in my opinion the order was jurisdictionally invalid when issued, by virtue of the War Labor Disputes Act and its adoption of the Norris-LaGuardia Act's policy, it follows that the violation gave no sufficient cause for sustaining the conviction for contempt. *Ex parte Fisk, supra.* Lewis and the United Mine Workers necessarily took the risk that the order would be found valid on review and, in that event, that punishment for contempt would apply. They did not take the risk that it would apply in any event, even if the order should be found void as beyond the jurisdiction of the Court to enter. See the dissenting opinion in *Carter* v. *United States,* 135 F. 2d 858, 862. The *Shipp* case furnishes no precedent for such a view nor do I know of any other in this Court which does.[27]

On the contrary that view has been long rejected, and I do not think we should disturb or depart from that settled course of decision now. "If the command of the writ [of mandamus] was in excess of jurisdiction, so neces-

---

[27] To be distinguished are cases in which Congress provides an adequate but limited opportunity for challenging the validity of administrative or other orders, but forecloses such opportunity when it is not taken as prescribed. See *Yakus* v. *United States,* 321 U. S. 414, cf. dissenting opinion, p. 460. See also *United States* v. *Ruzicka,* 329 U. S. 287; *Falbo* v. *United States,* 320 U. S. 549; *Estep* v. *United States,* 327 U. S. 114; *Gibson* v. *United States,* 329 U. S. 338. That is very different from affording no opportunity whatever except by obedience.

sarily were the proceedings for contempt in not obeying."
*Ex parte Rowland,* 104 U. S. 604, 617–618. The power of
the federal courts to issue stay orders to maintain the
*status quo* pending appeal, like other matters affecting
their jurisdiction except in the case of this Court's original
jurisdiction, is subject to Congress' control. That con-
trol has been exercised, in my view, to exclude such juris-
diction in cases of this character. And, this being true,
I do not think either this or any other court subject to that
mandate has power to punish as for contempt the viola-
tion of such an order issued in contravention of Congress'
command. *Ex parte Fisk, supra.*

### III.

The issues concerning the manner in which the con-
tempt proceeding was conducted are in themselves of
great moment, apart from the foregoing conclusions which
I think are dispositive of the controversy. And the
Court's rulings upon them are of such a character that
I cannot accede by silence.

At times in our system the way in which courts per-
form their function becomes as important as what they
do in the result. In some respects matters of procedure
constitute the very essence of ordered liberty under the
Constitution. For this reason, especially in the Bill of
Rights, specific guaranties have been put around the man-
ner in which various legal proceedings shall be conducted.
They differentiate sharply between the procedures to be
followed in criminal proceedings and in civil ones. These
differences mark one of the great constitutional divides.[28]
They separate the zone of punishment for crime, with
all its odious consequences, from that of giving civil re-
lief, where no such consequences attend, not partially but
completely.

[28] *Yakus* v. *United States,* 321 U. S. 414, dissenting opinion, at
479 ff.

In any other context than one of contempt, the idea that a criminal prosecution and a civil suit for damages or equitable relief could be hashed together in a single criminal-civil hodgepodge would be shocking to every American lawyer and to most citizens. True, the same act may give rise to all these varied legal consequences. But we have never adopted, rather our Constitution has totally rejected, the continental system of compounding criminal proceedings with civil adjudications.[29] Our tradition is exactly the contrary and few would maintain that this has had no part in bringing about the difference existing today for individual freedom here and in Europe.

I do not think the Constitution contemplated that there should be in any case an admixture of civil and criminal proceedings in one. Such an idea is altogether foreign to its spirit. There can be no question that contempt power was conferred adequate to sustain the judicial function, in both civil and criminal forms. But it does not follow that the Constitution permits lumping the two together or discarding for the criminal one all of the procedural safeguards so carefully provided for every other such proceeding.

The founders did not command the impossible. They could not have conceived that procedures so irreconcilably inconsistent in many ways [30] could be applied simultane-

---

[29] Thus, in some civil law countries damages, as well as other penalties, are assessed in a criminal proceeding. See Schwenk, Criminal Codification and General Principles of Criminal Law in Argentina, Mexico, Chile, and the United States: A Comparative Study (1942) 4 La. L. Rev. 351, 373–374; Goirand and Thompson, The French Judicial System and Procedure in French Courts (1919) 14. See also Esmein, A History of Continental Criminal Procedure (1913) 429–430.

[30] Upon the authorities, the following procedural provisions of the Bill of Rights, at least, would seem to apply to criminal contempt: The provision against double jeopardy, see *In re Bradley*, 318 U. S.

ously. Nor was their purpose to create any part of judicial power, even in contempt, wholly at large, free from any constitutional limitation or to pick and choose between the conflicting civil and criminal procedures and remedies at will. Much less was it to allow mixing civil remedies and criminal punishments in one lumped form of relief, indistinguishably compounding them and thus putting both in unlimited judicial discretion, with no possibility of applying any standard of measurement on review.[31]

---

50; the provision against self-incrimination, *Gompers* v. *Bucks Stove & R. Co.*, 221 U. S. 418, 444; the provision for due process insofar as it necessitates "suitable notice and adequate opportunity to appear and to be heard," *Blackmer* v. *United States*, 284 U. S. 421, 440; and, although the Sixth Amendment protections have been said not to apply as such to criminal contempts, *Myers* v. *United States*, 264 U. S. 95, 104–105; *Blackmer* v. *United States*, 284 U. S. at 440, but see text *infra*, doubtless at least the provisions for "a speedy and public trial," for "compulsory process" and for the assistance of counsel, see *Cooke* v. *United States*, 267 U. S. 517, 537, are implied in the due process provision of the Fifth Amendment. And it has been said that the protection against cruel and unusual punishments in the Eighth Amendment applies to criminal contempt, *United States ex rel. Brown* v. *Lederer*, 140 F. 2d 136, 139.

There are also protections not expressly included in the Bill of Rights which apply in criminal contempt, *e. g.*, that the defendant is presumed to be innocent and must be proved guilty beyond a reasonable doubt. *Gompers* v. *Bucks Stove & R. Co.*, 221 U. S. 418, 444. And see *Ex parte Hudgings*, 249 U. S. 378, 383: "Existing within the limits of and sanctioned by the Constitution, the power to punish for contempt committed in the presence of the court is not controlled . . . as to modes of accusation and methods of trial generally safeguarding the rights of the citizen. This, however, expresses no purpose to exempt judicial authority from constitutional limitations, since its great and only purpose is to secure judicial authority from obstruction in the performance of its duties to the end that means appropriate for the preservation and enforcement of the Constitution may be secured."

[31] See Part IV.

If this can be done in any case, it can be done in others. And that being true, if it can be done at all, not simply a loophole but a very large breach has been left in the wall of procedural protections thrown around the citizen's punishment for crime. For it is to be recalled that under the Court's ruling here upon the *Shipp* doctrine not merely the violation of valid judicial orders, but also the disobedience of invalid orders issued in excess of any court's jurisdiction becomes a crime and punishable as such by summary proceedings in criminal contempt, although the substantive rights involved in the litigation are wholly civil ones. The vastly expanded area of criminal conduct under this conception would afford equally wide room for dispensing with the criminal procedural protections under the unrestricted scope, otherwise than by "judicial discretion," which the present ruling concerning criminal or criminal-civil proceedings in contempt affords.

In my opinion, our system does not comprehend a power so unconfined anywhere within its broad borders, and it is time the large confusion about this were swept away.[32] It

---

[32] The confusion, at least as to the matter of indictments and jury trial, cf. note 33, has its origin in historical error exposed in Fox, The History of Contempt of Court (1927), and Frankfurter and Landis, Power of Congress over Procedure in "Inferior" Federal Courts—A Study in Separation of Powers (1924) 37 Harv. L. Rev. 1010. "Down to the early part of the eighteenth century cases of contempt even in and about the common-law courts when not committed by persons officially connected with the court were dealt with by the ordinary course of law, *i. e.*, tried by jury, except when the offender confessed or when the offense was committed 'in the actual view of the court.'" Frankfurter and Landis, *supra*, at 1042. Until 1720 "there is no instance in the common-law precedents of punishment otherwise than after trial in the ordinary course and not by summary process." *Id.*, 1046.

However, Wilmot, J., in 1765, influenced by Star Chamber procedure and precedents, although the Star Chamber had been abolished in 1641, stated that it was "immemorial usage" to punish all con-

is not necessary in this case to ask or decide whether all of the Constitution's criminal procedural protections thrown about all other criminal prosecutions, without suggestion of explicit exception, apply to criminal contempt proceedings. It is enough that we are sure some of them apply, as this Court has ruled repeatedly.[33] It does not matter that some of those which incontestably are applicable may not have been put in issue or preserved for review in this case.[34] The question cuts more deeply than the

tempts summarily. *Almon's Case,* Wilmot's Notes, p. 243.. And although this opinion was not published until thirty-seven years later, "there is ample evidence that, as a result of private communication between Wilmot and Blackstone, Wilmot's views of 1765 found their way, 'both in phrase and matter' into the fourth volume of the famous Commentaries published in 1769 . . . ." Frankfurter and Landis, *supra,* at 1046, n. 128. Wilmot's error "has bedevilled the law of contempt both in England and in this country ever since." *Id.,* 1047.

This history furnishes a slender thread indeed for thinking that the Constitution makers had no purpose to apply the usual procedural protections to criminal contempts. ". . . it is very doubtful whether at the date of the Constitution that doctrine [of *Almon's Case, supra*] did form part of the common law adopted by the United States. Mr. Justice Wilmot's undelivered judgement lay concealed until the year 1802, and, so far as is known, was not cited in an English Court until the hearing of *Burdett* v. *Abbot* in 1811. It was first cited with approval from the Bench in 1821, and was not therefore adopted as the common law of England until after the establishment of the American Constitution." Fox, *supra,* at 207.

[33] See note 30. It has been ruled consistently, however, that the rights to have the proceeding begun by indictment, Amend. V, and tried by jury, Amend. VI, do not apply. *E. g., Eilenbecker* v. *District Court,* 134 U. S. 31; *Gompers* v. *United States,* 233 U. S. 604; *In re Debs,* 158 U. S. 564.

[34] Defendants have not argued either in the District Court or in this Court that they are constitutionally entitled to a jury trial. And they expressly waived in open court whatever rights they had to an advisory jury. On the other hand if, as I think, the Norris-LaGuardia Act's provisions have been adopted for this and like cases, cf. Part I, § 11 of that Act of its own force secured the right of trial by jury and forbade waiver otherwise than in writing. Federal Rules of Criminal Procedure, Rule 23 (a).

application of any specific guaranty. It affects the right to insist upon or have the benefit of any.

This case is characteristic of the long-existing confusion concerning contempts and the manner of their trial, among other things, in that most frequently the question of the nature and character of the proceeding, whether civil or criminal, is determined at its end in the stage of review rather than, as it should be and as in my opinion it must be, at the beginning. *Gompers* v. *Bucks Stove & R. Co.*, 221 U. S. 418, 444. And this fact in itself illustrates the complete jeopardy in which rights are placed when the nature of the proceeding remains unknown and unascertainable until the final action on review.

Not only is one thus placed in continuing dilemma throughout the proceedings in the trial court concerning which set of procedural rights he is entitled to stand upon, whether upon the criminal safeguards or only on the civil. He also does not and cannot know until it is too late, that is, until the appellate phase is ended, whether one group or the other of appellate jurisdictional and procedural rules applies. Indeed he may find that his right of review has been taken either prematurely or too late depending entirely on whether the appellate court finally concludes that the proceeding has been civil or criminal in character.[35]

---

[35] In civil cases under Rule 73 appeal is taken by filing notice thereof "within the time prescribed by law," and generally, though there are exceptions, the time is three months. 28 U. S. C. § 230; *Mosier* v. *Federal Reserve Bank*, 132 F. 2d 710, 712. In criminal cases the Federal Rules now allow taking an appeal by filing notice of appeal as in civil cases. But an appeal must be taken by a defendant within 10 days after entry of judgment or after denial of motion for new trial. Rule 37 (a) (2). In *Nye* v. *United States*, 313 U. S. 33, it was held that 28 U. S. C. § 230 rather than the Criminal Appeals Rules governed timeliness in a criminal contempt appeal. But the new Criminal Rules would seem to apply to criminal contempts. *Moore* v. *United States*, 150 F. 2d 323, 324. See Rules 42 and 54; 55 Stat. 779, 18 U. S. C. § 689.

On certiorari, if the Rules of Criminal Procedure govern, there

See Swayzee, Contempt of Court in Labor Injunction Cases (1935) 21–22.

Precisely for these reasons this Court, when confronted in the *Gompers* case, *supra,* with a proceeding commingling civil and criminal features, such as we have here, refused to countenance such a mixture and, finding that the proceedings had been civil, held the criminal penalty of fixed terms of imprisonment to be invalid.[36]   The Court said:

> "There was therefore a departure—a variance between the procedure adopted and the punishment imposed, when, in answer to a prayer for remedial

---

is also a difference.  In civil cases the time for petitioning for certiorari is three months.  In criminal cases the petition must be filed within thirty days after entry of judgment.  Rule 37 (b) (2).  Compare *Nye* v. *United States, supra,* at 42, n. 6, as to the law prior to the new Criminal Rules.

The largest present difference between appeals in civil and criminal contempts is that, "except in connection with an appeal from a final judgment or decree, a party to a suit may not review upon appeal an order fining or imprisoning him for the commission of a civil contempt." *Fox* v. *Capital Co.,* 299 U. S. 105, 107, and cases cited.  Compare *Lamb* v. *Cramer,* 285 U. S. 217.  On the other hand, if the contempt is criminal, it may be directly reviewed. *Union Tool Co.* v. *Wilson,* 259 U. S. 107.  It has been held that where the contempt is both civil and criminal, the criminal procedure governs for purposes of review so that there may be immediate review of both the part that is civil and the part that is criminal. *Union Tool Co.* v. *Wilson, supra,* at 111; *Nye* v. *United States,* 313 U. S. at 42–43.

[36] There as here the contempt proceedings were entitled and conducted as collateral to civil litigation between the parties and the order for contempt had been grounded upon disobedience to a restraining order issued in the course of the litigation, conduct which would have sustained either civil or criminal penalty.  The Court of Appeals had held the proceeding criminal.  But this Court held it to be civil since it was collateral, not an independent suit at law to vindicate the public interest.  Hence, it followed that the criminal penalty could not stand.  Neither the Norris-LaGuardia Act nor the War Labor Disputes Act was then in force.

relief, in the equity cause, the court imposed a punitive sentence appropriate only to a proceeding at law for criminal contempt.   The result was as fundamentally erroneous as if in an action of 'A. *vs.* B. for assault and battery,' the judgment entered had been that the defendant be confined in prison for twelve months."   221 U. S. at 449.

Not only must the punishments be kept separate and distinct.[37]   This must be done with the entire proceedings.[38]   Punishment and civil relief must be correlated with the character of the proceeding.   Procedural rights

[37] Throughout the opinion the Court insisted the two forms of relief are altogether incompatible not only for interchangeability between the two types of proceeding, but necessarily for commingling in indistinguishable conglomeration.   Imprisonment as penalty for criminal contempt could be imposed for fixed terms, but in civil contempt this could not be done, the court's power being limited to remedial or coercive imprisonment, that is, until the person convicted should comply with the court's order.   So also with fines, which in civil contempt can be no more in amount than is commensurate with the injury inflicted or is necessary to secure compliance and must be contingent, whereas the limitation requiring correlation to the amount of injury does not apply to fines in criminal proceedings. 221 U. S. at 442–444, 449.   The same distinction applies as to the payment of costs.   P. 447.   See Part IV.

As will appear, this distinction is of paramount importance in this case.   And so it was in the *Gompers* case, for the main cause had been settled, and the Court held this required not only reversal, but dismissal of the contempt proceeding, which would not have been true in one for criminal contempt.   221 U. S. at 451–452.

[38] As with the factor of relief, the opinion throughout uses alternative, not conjunctive, language concerning the two types of proceedings.   Civil contempts, it said, "are between the original parties and are instituted and tried as a part of the main cause.   But on the other hand, proceedings at law for criminal contempt are between the public and the defendant, and are not a part of the original cause." 221 U. S. at 445.   See also p. 446.

not only in matters of practice,[39] but in others "which involve substantial rights and constitutional privileges," [40] are so distinct and in some instances contradictory that "manifestly" they cannot be intermingled. Nor can those applicable in criminal proceedings be disregarded when criminal penalty is sought. Not only such matters as the privilege against self-incrimination, the presumption of innocence, the necessity for proof beyond a reasonable doubt,[41] the allowance of costs, the appropriate mode of review [42] with attendant limitations of time and other differences, require this. What is most important, because the application and observance of all these rights and others depend upon it, is that the person charged is entitled to know from the beginning, not merely at the

---

[39] For example, most frequently perhaps the methods and times for securing appellate review, which at the time of the *Gompers* decision included whether the case could be reviewed by writ of error or appeal. 221 U. S. at 444; cf. *Bessette* v. *Conkey Co.,* 194 U. S. 324. See note 40; see also note 35.

[40] "The question as to the character of such proceedings has generally been raised, in the appellate court, to determine whether the case could be reviewed by writ of error or on appeal. *Bessette* v. *Conkey,* 194 U. S. 324. But it may involve much more than mere matters of practice. For, notwithstanding the many elements of similarity in procedure and in punishment, there are some differences between the two classes of proceedings which involve substantial rights and constitutional privileges. Without deciding what may be the rule in civil contempt, it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt, and cannot be compelled to testify against himself. *Boyd* v. *United States,* 116 U. S. 616; *United States* v. *Jose,* 63 Fed. Rep. 951; *State* v. *Davis,* 50 W. Va. 100; *King* v. *Ohio Ry.,* 7 Biss. 529; *Sabin* v. *Fogarty,* 70 Fed. Rep. 482, 483; *Drakeford* v. *Adams,* 98 Georgia, 724." 221 U. S. at 444.

[41] See note 40.

[42] See notes 35, 37, 39.

end or some intermediate stage,[43] in which sort of proceeding he is involved.

This, the Court said, "is not a mere matter of form, for manifestly every citizen, however unlearned in the law, by a mere inspection of the papers in contempt proceedings ought to be able to see whether it was instituted for private litigation or for public prosecution . . . . He should not be left in doubt as to whether relief or punishment was the object in view. He is not only entitled to be informed of the nature of the charge against him, but to know that it is a charge and not a suit. *United States* v. *Cruikshank,* 92 U. S. 542, 559." 221 U. S. at 446.

This rule has now been incorporated also in Rule 42 (b) of the Federal Rules of Criminal Procedure,[44] and was applicable in this case. By the terms of that rule the charge of criminal contempt was required to be "prosecuted on notice" and it was further commanded that the notice state "the essential facts constituting the criminal contempt charged *and describe it as such,*" which was not done here. The rule was adopted to outlaw "the frequent confusion between civil and criminal contempt proceedings," following immediately a suggestion made in *McCann* v. *New York Stock Exchange,* 80 F. 2d 211.[45]

---

[43] Cf. note 40.

[44] "A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. . . ." Rule 42 (b), Federal Rules of Criminal Procedure.

[45] Judge L. Hand's opinion in the *McCann* case reads in part as follows: ". . . the respondent will often find it hard to tell whether

See also *Nye* v. *United States,* 313 U. S. 33, 42–43. But it flatly incorporates the effect of the decision in the *Gompers* case, *supra.*

The language used by the Court was language of the Constitution, reinforced by citation of the *Cruikshank* case. Careful as it was about expressly overruling prior decisions [46] where the Sixth Amendment's requirement [47] had not been observed, there can be no doubt that the Court was announcing for the future that the constitutional requirement must be complied with. And the

---

the prosecution is not a remedial move in the suit, undertaken on behalf of the client. This can be made plain if the judge enters an order in limine, directing the attorney to prosecute the respondent criminally on behalf of the court, and if the papers supporting the process contain a copy of this order or allege its contents correctly. We think that *unless this is done the prosecution must be deemed to be civil and will support no other than a remedial punishment.* Nothing of the sort was done here, and the order must be reversed. . . ." (Emphasis added.) 80 F. 2d 211, 214–215.

The possibilities of confusion are multiplied when the contempt is instituted in a suit in which the United States is a party, since the United States may bring civil as well as criminal contempt proceedings. *McCrone* v. *United States,* 307 U. S. 61.

[46] The Court said: "Inasmuch, therefore, as proceedings for civil contempt are a part of the original cause, the weight of authority is to the effect that they should be entitled therein. But the practice has hitherto been so unsettled in this respect that we do not now treat it as controlling, but only as a fact to be considered along with others as was done in *Worden* v. *Searls,* 121 U. S. 25, in determining a similar question." 221 U. S. at 446.

[47] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and *to be informed of the nature and cause of the accusation;* to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U. S. Const. Amend. VI. (Emphasis added.)

374

result in the case itself accorded with what this view required.[48]

One who does not know until the end of litigation what his procedural rights in trial are, or may have been, has no such rights. He is denied all by a hide-and-seek game between those that are criminal and those that are civil. The view which would seem to be the only one consistent with the whole spirit of the Constitution, and with the nature of our free institutions, is that all of the constitutional guaranties applicable to trials for crime should apply to such trials for contempt, excepting only those which may be wholly inconsistent with the nature and execution of the function the court must perform.[49] As has been said, courts in performing this function are not above the Constitution; rather they are empowered to perform it in order to make the Constitution itself operative.[50] Accordingly, not the least but the greatest possible application of it to this phase of their work is the only rule consistent with their place in the constitutional scheme. *In re Michael,* 326 U. S. 224, 227.

Hence, whatever may be true of indictment and jury trials, I see no compelling reason whatever for not apply-

[48] Not only in the ruling that reversal was required for the imposition of the criminal penalty in the proceeding held to be civil, but also in the order for dismissal on the ground that the cause, including the contempt phase, had become moot. See note 37 *supra.*

[49] Cf. *In re Michael,* 326 U. S. 224, 227; dissenting opinion of Holmes, J., in *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, 422; *Michaelson* v. *United States,* 266 U. S. 42, 67: "The only substantial difference between such a proceeding as we have here [criminal contempt], and a criminal prosecution by indictment or information is that in the latter the act complained of is the violation of a law and in the former the violation of a decree. In the case of the latter, the accused has a constitutional right of trial by jury; while in the former he has not."

[50] See *Ex parte Hudgings,* 249 U. S. 378, 383, quoted in note 30 *supra.*

ing the other limitations of the Sixth Amendment. None of them is inconsistent with the due and proper performance of the court's function in criminal contempt. Some at the least are applicable by virtue of the due process guaranty of the Fifth Amendment. "Due process of law, therefore, in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. We think this includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed." *Cooke* v. *United States,* 267 U. S. 517, 537. Only one case, apart from those involving indictment or jury trial, has held the Sixth Amendment inapplicable in such proceedings.[51] Whether or not that case was a departure from our long established tradition that in criminal proceedings the defendant is entitled to be confronted with the witnesses against him, other departures should not be made.

Surely the rights to a speedy and public trial, to have compulsory process for obtaining witness in his favor, to have the assistance of counsel for his defense, and, as the *Gompers* case held, to be informed of the *nature* as well as the cause of the accusation, cannot be denied

---

[51] *Blackmer* v. *United States,* 284 U. S. 421, 440. The ruling was first made in *Myers* v. *United States,* 264 U. S. 95, 104–105, in connection with a statutory venue problem relating to judicial districts and divisions which is correlative constitutionally to the right of jury trial. The ruling was reasserted in *Ex parte Grossman,* 267 U. S. 87, 117, which held that the pardoning power extended to criminal contempts. In the *Grossman* case the statement was obviously dictum. In the *Myers* case it was dictum as to all guaranties except perhaps that of trial in the district where the crime was committed, a guaranty as stated above correlated to jury trial.

in our system to any person charged with crime, with the single exception of contempts committed in the immediate presence of the court by way of interference with the proceedings. Those guaranties are in no way inconsistent with the court's proper and complete discharge of its function in contempt. And they would seem to be essential to any conception of a fair trial as the Fifth Amendment's due process clause comprehends this.

When the assertion and securing of all other rights depends upon one, that one is the core of all. Here the right "to know that it was a charge, and not a suit" comprehended all other procedural rights in the trial and appellate courts. Without this, none could be asserted or maintained. The denial of that right, deferring it until the decision here is handed down, is in my opinion not only a denial of all. It is a violation both of the Constitution and of Rule 42 (b).

But we are told that this, and all that followed or may have followed from it, make no difference because there was no prejudice. There are at least two answers. This Court has held that the denial of constitutional guaranties in trials for crime is in itself prejudice. *Kotteakos* v. *United States,* 328 U. S. 750, 765, and cases cited in n. 19. The other, there was prejudice and in the most important thing beyond knowing the nature of the proceeding in advance of trial, namely, in the penalty itself.

## IV.

Not only was the penalty against the union excessive, as the Court holds. Vice infected both "fines" more deeply. As the proceeding itself is said to have been both civil and criminal, so are the two "fines." Each was imposed in a single lump sum, with no allocation of specific portions as among civil damages, civil coercion and criminal punishment. The Government concedes that some part of each

"fine" was laid for each purpose. But the trial court did not state, and the Government has refused to speculate, how much was imposed in either instance for each of those distinct remedial functions.

This was in the teeth of the *Gompers* and other previous decisions here. The law has fixed standards for each remedy, and they are neither identical nor congealable. They are, for damages in civil contempt, the amount of injury proven and no more, *Gompers* v. *Bucks Stove & R. Co., supra,* at 444; for coercion, what may be required to bring obedience and not more, whether by way of imprisonment or fine; [52] for punishment, what is not cruel and unusual or, in the case of a fine, excessive within the Eighth Amendment's prohibition. And for determining excessiveness of criminal fines there are analogies from legislative action which in my opinion are controlling.[53]

---

[52] As stated in note 37, coercive relief is civil in character, *Gompers* v. *Bucks Stove & R. Co.,* 221 U. S. 418, 442, the decree being when imprisonment is imposed that the defendant stand committed unless and until he performs the act required by the court's order. When this is done the sentence is discharged, for the defendant carries the keys of his prison in his own pocket. *In re Nevitt,* 117 F. 448, 461. The limitation is a corollary of the civil character of the remedy. This forbids imposition of fixed-term sentences for coercive purposes. *Gompers* v. *Bucks Stove & R. Co., supra,* although they have "incidental" coercive effects. *Id.,* at 443.

The purpose and character of the relief, not its particular form, determine its limits. *Id.,* at 443, citing *Doyle* v. *London Guarantee Co.,* 204 U. S. 599, 605, 607. Hence, when a fine is used in substitution for coercive imprisonment, it also must be contingent, giving opportunity for compurgation. Unless this is done, the fine takes on punitive character. *Doyle* v. *London Guarantee Co., supra.*

[53] It is in defining the nature and character of criminal penalties that legislative judgment and, within the authority it confers, the judgment of the trial court rather than appellate courts have the widest range. Legislative experience and judgment in this field therefore furnish a measure entitled to great and in some instances I think conclusive weight for consideration of the allowable range of punish-

The Government concedes that the Eighth Amendment's limitation applies to penalties in criminal contempt; and that in civil contempt the damages awarded cannot exceed the proven amount of injury. It also concedes, as I understand, that purely coercive relief can be no greater than is necessary to secure obedience. But in its view there was no necessity here for allocation of specific amounts in order to comply with these distinct standards. Rather punishment and damages may be lumped with a third undefined amount for civil coercion; and the whole mass sustained, without reference to the constituent elements or any of the established standards for measuring them, other than by over-all application of the Eighth Amendment's limitation to the mass. And in this view it maintains neither "fine" is excessive.

Obviously, however, when all these distinct types and functions of relief are lumped together, in a single so-called

---

ment, as such, in criminal contempts where the penalty is undefined by statute.

The only crime for which the amount of the fine has no maximum is treason, where the fine authorized is not less than $10,000. 18 U. S. C. § 2. For rescue of one convicted of a capital crime while going to or during execution the fine may be not more than $25,000. 18 U. S. C. § 248. Maximum fines of $20,000 are set for offering a bribe to a judicial officer and for acceptance of a bribe by a judge. 18 U. S. C. §§ 237, 238. The same maximum is set for mailing matter with intent to increase weight in order to increase the compensation of a railroad mail carrier. 18 U. S. C. § 358. In some cases of embezzlement and like crimes, the fine may be the amount embezzled, e. g., 18 U. S. C. § 173, and in one instance twice that amount. 18 U. S. C. § 172. But ordinarily the maximum allowed by Congress has been $10,000, and often it is less.

Moreover, where Congress itself has fixed a maximum fine for criminal punishment of the act held to be a contempt, that judgment would seem to furnish a standard to be applied in the contempt proceeding. See *In re Michael*, 326 U. S. 224, 227. In this case the War Labor Disputes Act authorized a fine of not over $5000 or imprisonment for not over one year, or both. 50 U. S. C. App. § 1506 (b).

"fine," none of the long-established bases for measurement can be applied, for there is nothing to which they can apply. We can only speculate upon what portion of each "fine" may have been laid to compensate for damages, what for punishment, and what, if any,[54] for civil coercion. Moreover, the District Court made no findings whatever concerning the amount of civil damages sustained, even if it could be assumed that there was evidence to sustain such findings.[55] And on the record none of the "fine" was made contingent, affording an opportunity for compurgation, as is required for coercive penalties.[56]

---

[54] The fines in this case were flat fines imposed absolutely, without contingency for compurgation or otherwise. The court acted on the Government's recommendation, which as to the union was made on the basis of $250,000 a day for the fourteen days elapsed after the restraining orders issued and the violations occurred. No part of the fine was laid contingently upon future conduct. Both penalties therefore would seem to be strictly criminal, or criminal combined with civil damages for past conduct, not coercive in the sense of coercive relief as contemplated in the decisions, see note 52, although the amounts fixed for each fine gave it "incidental" coercive effect in the popular sense. *Ibid.*

[55] The Government's asserted loss in revenues, chiefly relied on for this purpose, was not only highly speculative rather than proven in amount. It was injury which would have followed from the strike had it arisen before or after seizure. Such damages may result from any strike whether the Government or another is "employer," and would seem to be both speculative and indirect within the rule forbidding the award of such damages. *Hadley* v. *Baxendale,* 9 Exch. 341.

[56] See notes 54, 57. The order for coercive fines reads, by analogy to the order for coercive imprisonment, cf. note 52, that, unless there is obedience to the order of the court, the fine shall be paid on or before a day certain, in default of which the defendant shall be imprisoned until it is paid. See *Doyle* v. *London Guarantee Co.,* 204 U. S. 599, 602. In the case of corporations or unincorporated associations, the default provision is either that the responsible officers be imprisoned, *Parker* v. *United States,* 126 F. 2d 370, 379, or perhaps that execution issue against the contemnor's property. See *United States* v. *Ridgewood Garment Co.,* 44 F. Supp. 435, 436. Compare Rev. Stat. § 1041, 18 U. S. C. § 569, with 38 Stat. 738, 28 U. S. C. § 387.

It follows that we have no basis except our own speculative imagination by which to determine whether the so-called "fines," or either of them, are excessive as damages, or indeed as coercive relief looking to the future, or as penalty for past crime.

In this state of things, it is utterly impossible to perform our function of review in the manner heretofore required, even within the broad limits prescribed for cases of civil and criminal contempt. This commingling of the various forms of relief, like that of the proceedings themselves, deprives these contemnors of any possibility for having the scope of the relief given against them measured according to law.

That is no insubstantial deprivation. When hybrid proceedings can produce hybrid penalties, concealing what is for punishment and what remedial, what criminal and what civil, and in the process can discard constitutional procedural protections against just such consequences, as convenience or other wholly discretionary impulse may command, then indeed to the extent we allow this will we have adopted the continental tradition of the civilians and rejected our own. No case in this Court heretofore has ever sustained such conglomerate proceedings and penalties.[57]

That the Government is complainant here, both as "employer" seeking remedial relief and in sovereign capac-

[57] See the opinion of the Court, 330 U. S. 258, 300, n. 74. Only in rare instances have other federal courts, after consideration, done so. See *Kreplik* v. *Couch Patents Co.,* 190 F. 565. See also the discussion, by way of dictum, in *Hendryx* v. *Fitzpatrick,* 19 F. 810, 811, 813. In still other instances the two types of contempt have been mingled without discussion. See *Chicago Directory Co.* v. *United States Directory Co.,* 123 F. 194. And see *Wilson* v. *Byron Jackson Co.,* 93 F. 2d 577, dismissing for jurisdictional reasons an appeal from an order adjudging the appellants guilty of civil and criminal contempt.

ity [58] seeking to vindicate the court's authority by criminal
penalty, does not nullify all these long-established limi-
tations or put the courts wholly at large, limited by
nothing except their unconfined discretion as to the scope
and character of the relief allowable.  Power there is to
take adequate measures when violation is clearly shown
and adequate proof is made to sustain them.  For proven
violation, criminal penalty within the Eighth Amend-
ment's limits as we would measure similar impositions
placed by Congress, at the most; for damages proven and
found, civil award commensurate with the finding; and
for coercion, civil relief by way of imprisonment or "fine,"
but in either case contingent only, not final, giving oppor-
tunity for compurgation and for termination, on its being
made, of further penalty for the future.

These are the limitations the law has prescribed.  They
apply equally when the Government is complainant, and
whether in one capacity or the other, or both, as when
others are.[59]  They cannot be dispensed with, separately
or by conglomerating all into a single indiscriminate lump,
at the suit of the Government or another, in this case or
for others.  To permit this would be to throw overboard
the limitations prescribed by law and make the courts
purely discretionary arbitrators of controversies.  That
cannot be done in our system.

---

[58] The two capacities are distinct, not identical.  Each, it is true,
may be exercised ultimately in the public interest.  But if in the
capacity of temporary "employer" the Government is to have the
benefits of that status, it should be subject also to its limitations except
as Congress otherwise provides.  To jumble the two capacities as is
done here is only to nullify the rights in trial and remedy of employees
and others.

[59] The limitations upon criminal contempt, procedural and remedial,
always apply to the Government, for it alone can bring that proceed-
ing.  It cannot defeat them by mingling that proceeding and relief
with civil ones, merely by virtue of being also the complaining civil
litigant.

The Court seemingly recognizes this, in part, in the revision it makes of the District Court's penalties. Lewis' fine is affirmed in amount but wholly changed in character. Instead of composite relief as the District Court made it, the Court makes that fine wholly a criminal penalty, thus in effect increasing the amount of his criminal imposition. The union's fine, though held excessive and "reduced," by what standard is not apparent, is replaced by a flat criminal fine of $700,000 plus a contingent penalty of $2,800,-000 said to be entirely for civil coercion, although the strike was ended in December. Any award for civil damages allegedly sustained apparently is eliminated.

The Court thus purports to make separate the distinct items of relief commingled in the District Court's action. But in doing so, in my opinion, it wholly disregards the established standard for measuring criminal fines and its own as well as the District Court's function relating to them. If Lewis and the union had been convicted on indictment and jury trial in a proceeding surrounded by all the constitutional and other safeguards of criminal prosecution for violating the War Labor Disputes Act, the maximum fines which could be applied by that Act's terms would be $5,000 for each. In addition, Lewis could have been imprisoned for a year.[60]

In my opinion, when Congress prescribes a maximum penalty for criminal violation of a statute, that penalty fixes the maximum which can be imposed whether the conviction is in a criminal proceeding as such for its violation or is for contempt for violating an order of court to observe it temporarily. *Gompers* v. *United States,* 233 U. S. 604, 612. If the fine or other penalty in such a case can be multiplied twice or any other number of times, merely by bringing a civil suit, securing a temporary restraining order and then convicting the person who violates

---

[60] See note 53 *supra.*

it of criminal contempt, regardless of the order's validity and of any of the usual restraints of criminal procedure, the way will have been found to dispense with substantially all of those protections relating not only to the course of the proceedings but to the penalty itself.

But it is in relation to the flat criminal fine of $700,000 against the union that the Court's disregard of the constitutional and other standards is most apparent. By what measuring rod this sum has been arrived at as the appropriate and lawful amount, I am unable to say, unless indeed it is simply by a rough estimate of what the union should be forced to pay on all counts. Never has a criminal fine of such magnitude been heretofore laid and sustained, so far as I am able to discover. And only for treason, with one other possible exception,[61] has Congress authorized one so large. Moreover, the Court's enumeration of factors to be taken into account indicates expressly, as I read the opinion, that one is the coercive effect of the imposition for the future, though it is thoroughly settled that in contempt criminal punishment is to be laid only for past conduct.[62] *Gompers* v. *Bucks Stove & R. Co., supra,* and authorities cited.

Thus, the Court in effect imposes double coercive penalties, in view of the additional contingent award of $2,800,-000 for that specific and sole purpose. I think the criminal fine of $700,000 not only constitutionally excessive, far beyond any heretofore sustained for violation of any statute or order of court. It is also an unlawful commingling of civil coercive and criminal penalties, without the essential contingent feature in the coercive phase, under our prior decisions.

[61] *Ibid.*

[62] The opinion states: "In imposing a fine for criminal contempt, the trial judge may properly take into consideration . . . the necessity of effectively terminating the defendant's defiance as required by the public interest . . . ." 330 U. S. 258, 303.

Moreover, it is the District Court's function, not ours, in the first instance to fix the amounts of criminal fines. In equity proceedings for coercive relief, appellate courts including this one have power to revise and fix awards for such purposes, and if damages also are sought to review amounts awarded for this purpose for consistency with the proof. *Gompers* v. *Bucks Stove & R. Co., supra.* But in a criminal proceeding which is at law even in contempt, *ibid.,* our function is not in the first instance to fix the fines ourselves. That function is the District Court's. *Ibid.* We can only determine whether those imposed by it are excessive under the Eighth Amendment.

In its revision of the penalties therefore the Court in my opinion not only fails to unscramble the coercive and criminal elements, as the prior decisions here require to be done.[63] It imposes grossly excessive criminal penalties, determined in amount by wholly arbitrary estimate related to no previously established standard legislatively or judicially fixed. And in doing so, it usurps the District Court's function. All this flows in part at least from its basic error, which is its failure to follow the rule of the *Gompers* and other cases that not only civil and criminal penalties, but also civil and criminal proceedings are altogether different and separate things, and under the Constitution must be kept so.

Much more is involved in this controversy than the issues which have been discussed. The issues in the main suit have not been determined and it would be beyond our function to intimate opinion concerning them now. But

---

[63] The statement in the *Gompers* opinion, 221 U. S. at 443, that criminal penalties have incidental coercive effects and civil ones incidental penal effects, was not intended to contradict its ruling that criminal penalties cannot be imposed in civil contempt proceedings or therefore commingled indistinguishably.

beyond this controversy as a whole lie still graver questions. They involve opposing claims concerning the right to strike and the power of the Government, as against this, to keep the nation's economy going. Those are indeed grave matters.

No right is absolute. Nor is any power, governmental or other, in our system. There can be no question that it provides power to meet the greatest crises. Equally certain is it that under "a government of laws and not of men" such as we possess, power must be exercised according to law; and government, including the courts, as well as the governed, must move within its limitations.

This means that the courts and all other divisions or agencies of authority must act within the limits of their respective functions. Specifically it means in this case that we are bound to act in deference to the mandate of Congress concerning labor injunctions, as in judgment and conscience we conceive it to have been made. The crisis here was grave. Nevertheless, as I view Congress' action, I am unable to believe that it has acted to meet, or authorized the courts to meet, the situation which arose in the manner which has been employed.

No man or group is above the law. All are subject to its valid commands. So are the government and the courts. If, as I think, Congress has forbidden the use of labor injunctions in this and like cases, that conclusion is the end of our function. And if modification of that policy is to be made for such cases, that problem is for Congress in the first instance, not for the courts.

Mr. Justice Murphy joins in this opinion.